NO SUMMONS ISSUED

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
CV 13 -
-----------------------------------------------------

7291

BORIS FREIRE and MIRIAM OSORIO,
                    Plaintiffs,

**COMPLAINT**

**AND JURY DEMAND**

v.

NEW YORK MOTOR GROUP LLC,
PLANET MOTOR CARS, INC;
MAMDOH ELTOUBY,
NADA ELTOUBY,
JULIO ESTRADA a/k/a "John" a/k/a "John Santos"
a/k/a "Jay Santos" a/k/a "John Dos Santos" a/k/a "John Figueroa"
a/k/a "Jay Torres",  and
SANTANDER CONSUMER USA.

GARAUFIS, J.

                    Defendants.

LEVY, M.J.

-----------------------------------------------------

## INTRODUCTION

1.      This is an action for money damages, injunctive relief, and declaratory judgment, brought

by individual consumers seeking redress for unlawful practices relating to a transaction to

purchase an automobile and setting forth Defendants' violations of the Truth In Lending Act, 15

U.S.C. §§ 1601 *et seq.* ("TILA"), The Racketeering Influenced and Corrupt Organizations Act

("RICO") 18 U.S.C. § 1961, *et seq.*, New York Motor Vehicle Retail Installment Sales Act,

Personal Property Law ("MVRISA") § 302, *et seq.*; New York General Business Law

("NYGBL") §§ 349 and 350, New York State Usury Law, and setting forth common law claims

for Fraud, Breach of Contract, Rescission/Mistake, and Negligent Hiring Retention and Training.

2.      Plaintiffs bring suit on an individual basis as part of a series of related cases stemming

from the unfair, abusive and fraudulent practices employed by New York Motor Group and

Planet Motor Cars, Inc (collectively "the Dealerships" or "the Dealership") and their owners and

1

employees in their attempt to sell an automobile to and extract payments from Plaintiffs beginning on February 17, 2013.

3.      Upon information and belief, the Dealership Defendants' finance manager is Julio Estrada who has been preying on consumers for several years while working as the finance manager for various auto dealerships.

4.      On December 3, 2012, Mr. Estrada was arrested and indicted by a Queens County Grand Jury on multiple counts of theft, larceny, forgery and fraud related to his alleged actions while working as the finance manager for Auto Palace, Inc.

5.      On December 4, 2012 The Queens County District Attorney announced the indictment in a press release that identified Mr. Estrada as having defrauded over 23 consumers out of more than $115,000 with the promise that they could return to him to refinance their high rate loans after six months of on-time payments and thereby receive better rates and lower their monthly payment by hundreds of dollars.

6.      Within weeks of that indictment and arrest, Mr. Estrada was working for the Defendant Dealerships to manage their financing procedures in the sale of automobiles.

7.      On information and belief the Dealerships' Principal and Owner, Defendant Mamdoh Eltouby, was aware of or should have been aware of Mr. Estrada's arrest and indictment during all relevant times described herein.

8.      Upon information and belief, Mr. Estrada worked closely with Mamdoh Eltouby's daughter, Nada Eltouby, while overseeing the financing procedures for the dealership during all relevant times herein; and Ms. Eltouby knowingly assisted Mr. Estrada in placing consumers in loan obligations that resulted in thousands of dollars of unfair, deceptive, illegal and fraudulently induced overcharges as happened to Plaintiffs here.

2

9.     Upon information and belief, Mr. Estrada has used several aliases while working for the Dealerships including "John," "Jay," "John Dos Santos," "Jay Santos," and "John Figueroa."

10.    At all relevant times described in the complaint, Mr. Estrada was known to the Plaintiff only by the alias "John Dos Santos"

11.    Upon information and belief, in his role as Finance Manager for the Dealerships, Mr. Estrada has continued to prey on consumers in attempts to unfairly, illegally, and fraudulently increase the costs of transactions to consumers for the benefit of all Defendants and obtain cash payments under the false pretense of refinancing consumers' loans.

12.    As will be described in full detail below, this is precisely what occurred to Plaintiffs in their dealings with the Dealerships.

## JURISDICTION AND VENUE

13.    Jurisdiction is based on 15 U.S.C. § 1640 and 28 U.S.C. § 1337.

14.    The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

15.    This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

16.    Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and Defendants maintain offices, transact business, and are otherwise found in this district.

## THE PARTIES

17.    Plaintiff Boris Freire is a resident of Hudson County, New Jersey.

18.    Plaintiff Miriam Osorio is a resident of Hudson County, New Jersey.

19.     Plaintiffs are an unmarried couple cohabitating and raising a family together in the State of New Jersey.

20.     Plaintiffs sought to finance the purchase of a vehicle from Defendants for their personal and family's use.

21.     Defendant NY Motor Group LLC ("NYMG" or "Dealership") is a domestic limited liability company under the laws of New York, whose principal place of business is located in Woodside, New York in Queens County.

22.     Defendant Planet Motor Cars, Inc. ("Planet Motor Cars") is a corporation incorporated under the laws of New York, whose principal place of business is located in Jamaica, New York in Queens County.

23.     Defendant Mamdoh Eltouby is the owner of NYMG and, upon information and belief, is the owner or has an ownership interest in Planet Motor Cars.

24.     Mr. Eltouby's principal place of business is at New York Motor Group in Queens County.

25.     Mr. Eltouby currently determines the policies and procedures of NYMG and Planet Motor Cars and makes decisions to hire, train and retain employees, in particular the finance manager for the Dealerships.

26.     At the time of Plaintiff's transaction, Mamdoh Eltouby was the primary decision maker and the prson who managed the day-to-day operations of NYMG and Planet Motor Cars.

27.     Mamdoh Eltouby is the primary decision maker and the person who manages the day-to-day operations of NYMG and Planet Motor Cars.

28.     On information and belief, NYMG and Planet Motor Cars are united in interest in the same business venture, such that separate business entities do not exist and/or are irrelevant to

4

liability under TILA, NYGBL, NYGOL § 5-501, and laws of New York as alleged herein and each entity will be collectively and interchangeably referred to hereafter as "the Dealership" or "the Dealerships" or "Dealership Defendants."

29.     Defendant Nada Eltouby is Mamdoh Eltouby's daughter and is employed by the Dealership where she assists with the sale and financing of vehicle purchases.

30.     Ms. Eltouby's business address is at NYMG.

31.     Julio Estrada is an employee of the Dealership whose primary responsibility is management of the Dealership's financing process.

32.     Julio Estrada's business address is at NYMG.

33.     Defendant Santander Consumer USA, Inc. ("SCUSA") is a corporation incorporated under the laws of the State of Illinois, whose principal place of business is located in Dallas, Texas.

34.     SCUSA is the assignee of a Retail Installment Contract between Plaintiff and the Dealership Defendants and, therefore as an assignee, is liable for all claims asserted against the Dealership under State and Federal law.

## FACTS

35.     In February 2013, Plaintiff saw an advertisement on the website of New York Motor Group www.newyorkmotorgroup.com for a 2010 Honda Odyssey mini-van. ("the vehicle"). The advertisement offered the vehicle for sale for $14,900.

36.     On or about February 17, 2013, Plaintiffs went to the Dealership at 60-20 Northern Boulevard Woodside, NY and inquired about purchasing the vehicle.

37.     This visit and the transaction described herein was the first time that Mr. Freire and Ms. Osorio, had ever attempted to purchase a car from a dealership and was the first time Plaintiffs had ever entered into loan agreement.

38.     At the dealership on February 17, 2013, Plaintiffs met with a sales person who introduced himself as "Dewan" and viewed the vehicle.

39.     Another dealership employee who introduced himself as "Felix" also discussed the vehicle with Plaintiffs while at the Dealership on February 17, 2013.

40.     "Dewan" and "Felix" confirmed for Plaintiff that the sale price was $14,900.

41.     Mr. Freire agreed to purchase the vehicle for the advertised and confirmed sale price of $14,900.

42.     Thereafter that evening, Mr. Freire was introduced to the dealership finance representative who introduced himself as "John Dos Santos" who also agreed to sell the vehicle for the advertised price of $14,900.

43.     Through Mr. Dos Santos, the dealership promised Mr. Freire that he could finance the purchase of the vehicle for a total of $20,241.06, including his downpayment, a "bank fee" of $1360, and all monthly payments and interest.

44.     After allegedly reviewing Mr. Freire's credit history, Mr. Dos Santos, on behalf of the dealership, explained that due to his low credit rating, Mr. Freire he would have to accept one of the two following options for financing the vehicle:

> i.   $400 per month payments, for 60 months with an un-identified assignee finance company; or

     ii.  Finance the vehicle with Santander who will require monthly payments of $624.72, but after 4 months, the dealership would refinance his loan and reduce his payments to $155.27 per month.

45.    All of the terms of the second financing "option" with Santander were memorialized in a hand written note that Mr. Dos Santos created for Mr. Freire.

46.    Mr. Freire agreed to the terms of the second option and agreed to return the next day with a down payment of $7500 to complete the deal.

<b>The Scam to Inflate the Vehicle Price</b>

47.    Mr. Freire returned to the dealership on Monday February 18, 2013 with his down payment, but was told by other dealership employees that Mr. Dos Santos was not in that day and therefore the dealership could not complete the transaction until the following day.

48.    Accordingly, Mr. Freire returned on Tuesday February 19, 2013.

49.    That day, he met again with Mr. Dos Santos, who provided Mr. Freire with a retail installment contract (RIC) that listed a vehicle cash price of $30,199.96, showed a down payment of $10,500, and with a $3000 charge for the service contract, revealed that the total amount to be financed would be $22,999.96.

50.    The RIC also showed that Mr. Freire would be obligated to monthly payments of $624.12 for 60 months at 20.74% APR, resulting in a total payment of $47,947.20 over the life of the loan. The RIC is attached here as <u>Exhibit A</u>.

51.    After being presented with this RIC on February 19, 2013, Mr. Freire protested and pointed out that the amounts in the RIC did not match the terms that were promised to him previously.

52.     Mr. Dos Santos, on behalf of the dealership, explained that Santander Consumer USA, required Mr. Freire to purchase a "package" of other products, which included Insurance and a Service Contract.

53.     Mr. Dos Santos represented that the service contract cost $3000 and that the price for the insurance was $5,500.

54.     Mr. Dos Santos further explained that for the cost of $5,500 the insurance would provide full coverage and liability for 5 years for the vehicle as well as Mr. Freire's wife's car, a '98 Plymouth Voyager.

55.     As this payment would be made upfront as part of the purchase of the vehicle, Mr. Dos Santos further explained that Mr. Freire would not have to make any monthly payments for insurance and would essentially be getting complete insurance and liability coverage for an average of about $91.66/month.

56.     Mr. Dos Santos stressed that, although this insurance was required by SCUSA for the financing agreement, this would be a much better deal for insurance coverage than any other insurance company would provide.

57.     Mr. Dos Santos also explained that in order to finance with Santander the dealership had to increase the price of the vehicle by $3000, but that the dealership would also increase the disclosed amount of the deposit by $3000.

58.     Mr. Freire continued to question why all of these changes were being made and why the terms of the deal had changed so much from those that were disclosed to him two days earlier.

59.     Mr. Dos Santos assured Mr. Freire, however, that he need not worry about the RIC, because he would only be locked into that loan with Santander for 4 months.

60.     Mr. Dos Santos also reassured Mr. Freire that the dealership would refinance the loan at the end of the four months as promised, and would thereby reduce his monthly payments to $155.27 thereafter, which would result in a total payment of $20,241.06 after all fees and interest were paid.

61.     Trusting the Dealership's promises, Mr. Freire signed the retail installment contract, the service contract, and a Theft Deterrent Product Protection Certificate, among other documents that were quickly placed in front of him by Mr. Dos Santos.

62.     Significantly, the Theft Deterrent Certificate listed the vehicle purchase price as $14,900. It is attached here as Exhibit B.

63.     Thereafter, Mr. Freire was given the keys to vehicle and left the dealership with it.

64.     On or about February 19, 2013, the Dealership transmitted information by email, fax and/or other electronic means to SCUSA and/or other financial institutions about Mr. Freire, the RIC, and other financial details in order to assign and receive payment for the RIC.

### The Insurance Scam

65.     Over the course of several months between June 2013 and October 2013, Mr. Freire also had several conversations with Mr. Dos Santos and other Dealership employees regarding problems with the insurance coverage that he was promised, and for which he was charged $5,500.

66.     Though Mr. Dos Santos promised that he would receive one in the mail, Mr. Freire had not received any insurance card related to the insurance purchased through the Dealership.

67.     In or about the first part of August 2013, however, Mr. Dos Santos told Mr. Freire to cancel the current coverage he had on both of his family's vehicles through State Farm, as the

new coverage under the agreement with the Dealership was in place and that the cards would be received soon.

68.    Shortly after cancelling the State Farm coverage, as directed, however, Mr. Freire and his wife received a ticket from the State of New Jersey, dated August 21, 2013, because there was no insurance coverage on the '98 Plymouth that Ms. Osorio was driving.

69.    After several more unfruitful conversations with Mr. Dos Santos and other dealership employees, in September 2013, Mr. Freire contacted Progressive, the company that was allegedly providing the promised insurance coverage.

70.    For the first time, during his phone call with Progressive, Mr. Freire learned that the insurance he was charged for did not provide full coverage for both vehicles and that it provided no liability for either vehicle.

71.    Mr. Freire then reinstated his previous policy with State Farm for coverage on both family vehicles.

72.    Subsequently, throughout the month of September, Mr. Freire contacted Mr. Dos Santos several times and requested that the dealership cancel the insurance and refund the $5,500 he was charged for it.

73.    Mr. Dos Santos, on behalf of the dealership, agreed to cancel and refund the money. Since that time, however, Mr. Freire has begun to receive bills from progressive demanding a monthly premium payment of $316; and to date, Mr. Freire has received no refund or notice that any refund has been sent to Santander crediting him for the $5,500.


**The Refinancing Scam**

74.     The dealership's fraud reached a new level, when Mr. Freire began contacting them in July 2013 in order to arrange for the promised refinancing that would reduce his monthly payments to $155.27.

75.     First, he was repeatedly put off by Mr. Dos Santos for several weeks each time he attempted to contact him as directed to arrange for the refinancing.

76.     During the months of July and August Plaintiffs made several visits to the dealership and had conversations with other employees regarding the promised refinancing and Mr. Dos Santos' recalcitrance, including conversations with Nada Eltouby who identified herself to Mr. Freire as "the owner's daughter," provided excuses for Dos Santos' absences and recalcitrance, and encouraged Plaintiffs to continue getting in touch with Mr. Dos Santos in order to complete the transactions.

77.     Through text messages, phone calls and in person conversations in the months of July and August 2013 Mr. Freire was regularly attempting to speak to Mr. Dos Santos about refinancing as Mr. Freire had completed four months of payments and was finding it a financial burden to continue paying the high monthly payments to Santander.

78.     Finally, on August 16, 2013, Mr. Freire returned to the dealership and managed to speak with Mr. Dos Santos about the refinancing in person.

79.     Nada Eltouby was a part of this conversation.

80.     Mr. Dos Santos advised that he could arrange the refinancing that day with Bank of America, but that Mr. Freire would have to pay $3000 to arrange for the transaction.

81.     Mr. Dos Santos further advised that Mr. Freire could only get the previously promised refinancing deal on that day with the newly demanded $3000 payment and if he did not do it on

that day, he would be stuck in the high interest-high monthly payment loan with Santander for the remaining 56 months.

82.     Understandably terrified by that prospect, Mr. Freire immediately went out to the closest TD Bank on Steinway Blvd. in Astoria, withdrew $3000 and returned to the dealership.

83.     Thereafter on August 16, 2013, Mr. Dos Santos took the $3000 in cash and prepared a second Retail Installment Contract (Second RIC)on behalf of the dealership that lists out patently false disclosures of the loan terms.  To wit:  it lists a vehicle cash price of $18,500, a $3000 down payment, an amount financed of $15,500, 8.77% APR, total finance charges of $6800.32, total payments of $4000.32 and a total sale price of $7,000.32.

84.     The Second RIC also discloses 54 monthly payments of $74.08.

85.     The Second RIC is attached as Exhibit C.  Clearly the financial disclosures on the document are mathematically impossible.

86.     And although the Second RIC was presented to Plaintiffs on August 16, 2013, it is dated February 19, 2013.

87.     And although the Dealership promised to refinance the loan with Bank of America, the Second RIC indicates that it will be assigned to SCUSA.

88.     Mr. Dos Santos assured Mr. Freire and Ms. Osorio that with the $3000 payment that the dealership would arrange the refinancing with Bank America.

89.     Upon information and belief, the dealership had no intention of ever arranging refinancing for Mr. Freire and used the false contract as a means for obtaining $3000 cash from Mr. Freire.

90.     Desperate to obtain the lower monthly payments that they had been promised by the dealership, the Plaintiffs signed the contract.

91.    The Dealership, however, did not sign the Second RIC.

92.    To date, Mr. Freire has not received any documents from Bank of America, or any other lender regarding the refinancing of this loan.  Instead, he has continued to receive monthly demands from Santander to make $624 payments on the original loan.

93.    As Plaintiffs have continued to receive bills and demands for the regular monthly payment of $624.12 from SCUSA, Mr. Freire contacted the dealership via phone and text message throughout September and October 2013 to inquire about the refinancing they had now paid $3000 to have arranged.

94.    In September 2013, Mr. Dos Santos, on behalf of the dealership, promised that he would take care of making the necessary payments to Santander.

95.    On October 4, 2013, Mr. Freire sent a text message to Mr. Dos Santos informing him that SCUSA called him daily to demand payment on the loan, which at that point had gone 43 days late.

96.    Mr. Freire texted Mr. Dos Santos again on October 8 and October 9 begging Mr. Dos Santos to contact him to let him know when the dealership would be taking care of refinancing and cover the late payments to Santander.

97.    As SCUSA continued to call Mr. Freire to demand the payments they had not yet received, Mr. Freire continued to text Mr. Dos Santos for an explanation.

98.    On October 19, 2013, Mr. Dos Santos texted Mr. Freire to request that Mr. Freire call him.  Mr. Freire did so and explained that SCUSA was still waiting for payment.

99.    Mr. Dos Santos promised to take care of the payments and asked Mr. Freire to send him the bills from SCUSA.

100.   That day, Mr. Freire sent Mr. Dos Santos jpeg images of the SCUSA bills for 60 days of payments along with a recent bill he had received for monthly payment to Progressive Insurance.

101.   When Mr. Freire texted for confirmation of receipt, Mr. Dos Santos texted back on October 21, 2013 saying "Yeah papa. Thank u I got it."

102.   To date the dealership has not made any payments to SCUSA on behalf of Mr. Freire.

103.   With great difficulty, Mr. Freire has brought the payments to SCUSA current.

104.   Upon information and belief, the finance representative "John Dos Santos" is the alias of Julio Estrada.

105.   Mr. Estrada was arrested and indicted on multiple counts in Queens County in December, 2012 for acts or theft, larceny, forgery and fraud related to his alleged promises while working at another auto dealership as a finance manager that customers could return to see him to refinance their high rate loans after six months of on-time payments and thereby receive better rates and lower their monthly payment by hundreds of dollars.

106.   After having put down $10,000 on the date of the initial transaction, Mr. Freire has been making monthly payments to SCUSA towards pay off of a loan for $22,999.96 for the purchase of a vehicle advertised at $14,900.

107.   At all relevant times Defendants acted willfully and in bad faith.

108.   The unlawful actions described herein harmed Plaintiffs.

## COUNT I
## TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")

109.   Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

14

110.  Plaintiff's transaction as described herein was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

111.  Defendants are creditors within the meaning of TILA and Regulation Z.

112.  The increase in the cash price of the vehicle from the originally confirmed price of $14,900 is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

113.  The cash price increase of over $13,000 is attributable to items and charges that Plaintiff was required to pay incident to the extension of credit to Plaintiff, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

114.  As a result of Defendants' failure to properly include these and/or other fees and charges as finance charges, the sale price, finance charge, amount financed, and APR disclosed in Plaintiff's RIC are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

115.  Defendants have failed to provide Plaintiff with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z.  e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

116.  As a result of Defendants' incomplete, inaccurate, and materially misstated disclosures, Plaintiff has suffered actual damages, including but not limited to the over $13,000 in extras that Plaintiff did not want or need but was required to purchase as a condition of receiving financing.

117.  Had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would not have agreed to purchase the vehicle on the terms and conditions imposed on him by the Defendants and instead would have sought to purchase a

vehicle without the unwanted and unnecessary warranties and additional charges imposed on him by the Defendants.

118.    Additionally, had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiff would have sought and obtained alternate, lower cost financing.

119.    For all these reasons, Defendants are liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees, litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

**COUNT II**
**TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA")**
**(Against Dealerships, Mamdoh Eltouby, Nada Eltouby, and Julio Estrada only)**

120.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

121.    Plaintiffs' transaction as described in ¶¶ 74-108 above, was a consumer credit transaction within the meaning of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), and Federal Reserve Board Regulation Z, 12 C.F.R. part 226.

122.    Defendants are creditors within the meaning of TILA and Regulation Z.

123.    The $3000 payment demanded from Plaintiffs by the Dealership in order to "refinance" the vehicle loan was a required payment incident to the extension of credit to Plaintiffs, and is a "finance charge" as defined under TILA § 1605(a) and Regulation Z § 226.4(a).

124.    This $3000 charge was inaccurately described as a down payment on the second Retail Installment Contract (Exhibit C) allegedly prepared for the refinancing.

125.    In fact, the sale price, finance charge, amount financed, and APR disclosed in in the Second Retail Installment Contract (Exhibit C) are all materially misstated, in violation of TILA and Regulation Z. e.g. § 1638(a)(2) through (5) and §226.18(b), (d), (e), and (h).

126.    Defendants have failed to provide Plaintiffs with clear and conspicuous disclosures of the terms of the loan as required under TILA and Regulation Z. e.g. 15 U.S.C. § 1632(a), § 1638(a), and Regulation Z, e.g. 12 C.F.R. § 226.17(a)(1).

127.    As a result of Defendants' materially misstated disclosures, Plaintiffs have suffered actual damages, including but not limited to the loss of $3,000 that was required to refinance a loan that was never refinanced.

128.    Had Defendants provided complete and accurate disclosure of all terms, costs, finance charges and interest rates, Plaintiffs would not have agreed to pay $3000 to refinance the loan with the dealership and instead would have sought refinancing elsewhere at a lower cost and with an entity that would have actually refinanced the loan as promised.

129.    For all these reasons, Dealership Defendants are liable under TILA and Regulation Z (see, e.g. 15 U.S.C. §§ 1640 and 1641) for statutory damages, actual damages, attorney's fees, litigation expenses and costs, for a declaratory judgment that they have violated TILA and Regulation Z, and for such other or further relief as the Court deems appropriate.

## COUNT III
## CIVIL VIOLATIONS OF RICO, 28 U.S.C. § 1692(c) & (d)

130.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

131.    Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

132.    Defendants are natural persons and legal entities, and as such are "persons" within the meaning of 18 USC § 1961(3).

17

133. On information and belief, the Dealerships, Mamdoh Eltouby, Nada Eltouby, and Julio Estrada (collectively "the Enterprise Defendants") comprise distinct groups of persons that together form an enterprise within the meaning of 18 U.S.C. § 1961(4). Each and every one of these defendants is employed by or associated with the enterprise.

134. On information and belief, the Dealership, Mamdoh Eltouby, Nada Eltouby, and Julio Estrada also qualify as separate and distinct enterprises within the meaning of 18 U.S.C. § 1961(4). Each and every one of these defendants is employed by or associated with the Dealerships.

135. On information and belief these individuals and entities taken together are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

136. The purpose of the enterprise and/or enterprises (collectively "Enterprise") is to secure payments from financial institutions by assigning Motor Vehicle Retail Installment Contracts that were obtained through fraudulent means used to inflate advertised prices and place consumers in larger debt obligations. The relationships between the Enterprise Defendants are longstanding and ongoing.

137. The Enterprise has been ongoing for at least one year and engaged in and continues to engage in activites that affect interstate commerce. The Enterprise in violation of RICO has been and remains longstanding, continuous and open ended.

138. The Enterprise Defendants, individually and collectively, as an Enterprise, have engaged directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

139.   Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and to obtain money or property by means of false or fraudulent pretenses and representations. The scheme includes but is not limited to:

a.  Advertising sale prices for vehicles on the internet and elsewhere that appear to be discounted and in some instances deeply discounted for thousands of dollars under market value in an effort to lure more consumers to the Dealership

b.  Preparing Retail Installment Contracts for the sale of motor vehicles that inflate the price of the vehicles beyond those that are advertised by falsely telling consumers that they are required to purchase additional products such as service contracts, warranties, and insurance policies in order to obtain financing;

c.  Obtaining payments from or on behalf of consumers for promised insurance policies that are not real or are not created for the consumers as promised;

d.  Preparing service contracts and theft deterrent product protection forms in order to induce payments from or on behalf of consumers when in fact, no service contract or product protection policy is actually put in place for the consumer;

e.  Inducing consumers to enter into loan obligations with higher than necessary payments, higher than advertised prices, and the inclusion of unnecessary and/or non-existent additional products with the false promise that consumers may return to the Dealership within 4-8 months to refinance the loans and receive significantly reduced interest and monthly payment obligations; and

f.  Obtain payments from consumers by promising to arrange refinancing with banks or credit unions on more favorable terms without having any intention and without making any effort to actually arrange the refinancing.

140. The Enterprise Defendants, acting individually and as part of the Enterprise have made fraudulent misrepresentations on specific occasions as follows:

    a. On December 20, 2012; December 27, 2012, February 19, 2013 Defendants conveyed to consumers, including Plaintiffs herein, that they were required to purchase service contracts and or insurance policies in order to obtain financing through the Dealerships assignee's when that was not true and in fact, they are prohibited from requiring the purchase of additional products beyond the subject vehicle when arranging financing.

    b. On December 27, 2012 and February 19, 2013 Defendants obtained payments from consumers, including Plaintiffs herein, with the false promise that the consumer could return to the Dealership in 4-8 months to refinance their loans at more favorable terms.

    c. On December 27, 2012, January 3, 2013, February 19, 2013, July 17, 2013 and August 16, 2013 Defendant Estrada on behalf of the Enterprise promised to arrange to refinance consumers loans, including Plaintiff's herein, with Bank of America and/or People's Credit Union and/or other financial institutions, when it was not possible or when Defendants had no intention of doing so.

    d. On August 16, 2013, Defendants obtained a payment of $3,000 from Plaintiffs with the false promise to refinance the Mr. Freire's loan with Bank of America when it was not possible or when Defendants had no intention of doing so.

141. Enterprise Defendants acting individually and as part of the Enterprise, have used the wires and have caused the wires to be used, or reasonably knew the wires would be used, in furtherance of their fraudulent scheme. Specifically:

a.  In December 2012 and February 2013 the Enterprise Defendants used the internet to advertise prices for vehicles on websites including cars.com; autotrader.com, and newyorkmotorgroup.com that listed prices that appeared discounted, in some instances deeply so, but in actuality were only listed to lure consumers to the dealership in order to then place them in loan obligations with drastically increased vehicle prices.

b.  On or about February 19, 2013 Enterprise Defendants transmitted fraudulently prepared documents, as described in detail here in ¶ 64, by fax, email or other electronic means to lending institutions in order to assign and obtain payments for the RIC.

c.  On October 19, 2013 Defendant Estrada communicated by SMS or Text message to Mr. Freire in furtherance of the fraudulent refinancing scheme as described in detail in ¶¶ 96-101 above.

d.  On October 21, 2013 Defendant Estrada again communicated by SMS or Text message to Mr. Freire in furtherance of the fraudulent refinancing scheme as described in detail in ¶¶ 96-101 above.

142.  Defendants have used the wires in connection with every fraudulently induced retail installment contract they have obtained, and each use of the wires has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiff and other consumers by means of false pretenses and representations.

143.  On information and belief, each and every defendant has specific knowledge that the wires are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that the wires would be used because the

Dealerships' business model relies on faxes and electronic communications with financial institution assignees and others in order to obtain payments. Indeed, the dealership relies on the electronic communication system of DealerTrack, Inc. in order to have quick communication with financial institutions in order to assign and receive payments on the loans it creates with consumers.

144. Each of the uses of the wires in connection with Defendants' schemes to defraud in the past year constitutes a separate instance of wire fraud within the meaning of 18 U.S.C. § 1341 and 1343, and thus is also a predicate act, which taken together, constitute "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

145. In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 *et seq.,* and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated.

146. As described here, the goal of the Enterprise is to obtain larger payments from or on behalf of consumers through the use of fraudulent means such as false promises of refinancing or the "requirement" of unnecessary or bogus products.

147. The pattern of racketeering activity described above is integral to the Enterprise Defendants' scheme. Without engaging in wire fraud, Defendants would be unable to obtain the larger payments they seek.

148. Each Enterprise Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs

through the pattern of racketeering activity described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

149.   Moreover, each Enterprise Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of mail and wire fraud described above, and has thus violated 18 U.S.C. § 1962(d).

150.   As a direct and proximate result of the RICO violations described in this Complaint, Plaintiff and other consumers have suffered substantial injuries. Plaintiff has had money extracted from him, been obligated to a larger financial burden than originally promised, and has incurred costs that he was promised he would not have to incur (e.g. the continued payment for insurance coverage outside of the RIC), thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1 962(c) & (d).

151.   Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced over a year ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds, if not thousands, of consumers, including Plaintiffs.

152.   For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

## COUNT IV
## VIOLATIONS OF NEW YORK MOTOR VEHICLE
## RETAIL INSTALLMENT SALES ACT § 302, et seq. (MVRISA)

153.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

154.   The Plaintiffs are "retail buyers" within the meaning of MVRISA § 301(2).

155.   The Dealership is a "retailer seller" within the meaning of MVRISA § 301(3).

156.   The transaction as described above was a "retail instalment sale" within the meaning of MVRISA § 301(4).

157.   Under MVRISA § 302(1) a motor vehicle retail installment contract shall contain all of the agreements between the parties.

158.   Under MVRISA § 302(5) a retail installment contract shall also contain any amount included for insurance, "specifying and describing the coverage and the amount included for each type of coverage."

159.   The First RIC presented to Plaintiffs and signed on February 19, 2013 did not contain all of the agreements between the parties.  To wit:  the Dealership promised that Plaintiffs would be able to refinance their loan and receive lower monthly payments after 4 months; but this material term was not contained anywhere in the First RIC, though it was memorialized in a written note provided to Plaintiffs by the dealership.

160.   Accordingly the dealership violated MVRISA § 302(1) by providing a retail installment contract that did not contain all of the terms of the agreement.

161.   Moreover the plaintiffs were charged $5,500 for insurance coverage but this charge and a description of the coverage was not detailed in the First RIC as required.

162.   Accordingly, the dealership violated MVRISA § 302(5) by providing a retail installment contract that did not include the amount paid for insurance coverage or specify and describe the coverage.

163.    Furthermore, Under NY PPL § 302(1) a retail installment contract shall be signed by the buyer and the seller; and under MVRISA § 302(4) shall contain the identity of the seller including the seller's place of business.

164.    Under MVRISA § 302(3) the seller is required to deliver a copy of the retail installment contract that is signed by the seller.

165.    The Second RIC presented to Plaintiffs to allegedly arrange for refinancing was signed only by the Plaintiffs on August 16, 2013; and the Dealership has never provided a copy of the Second RIC properly identifying or signed by the dealer.

166.    Accordingly the Dealership violated MVRISA §§ 302(1), 302(3) and 302(4).

167.    Moreover, under MVRISA § 302(3), Plaintiffs are entitled to cancel the Second RIC and receive immediate refund of all payments made thereunder.

168.    Finally, under MVRISA § 302(5) the RIC must comply with all of the disclosure requirements of TILA.  As described above neither RIC complies with TILA and thus also violates MVRISA for failing to properly disclose finance charges.

169.    And for all of the reasons stated herein, under MVRISA § 307, Defendants are barred from recovering any credit service charge, delinquency, or collection charge or refinancing charge on either of the retail installment contracts involved.

## COUNT V
## VIOLATION OF NEW YORK CIVIL USURY LAWS

170.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

171.    Pursuant to General Obligations Law § 5-501, the legal rate of interest in New York is "six per centum per annum unless a different rate is prescribed in §14-a of the Banking Law." Section 14-a (1) provides: "The maximum rate of interest provided for in section 5-501 of the general obligations law shall be sixteen per centum per annum."

172.    The Dealership is not a "national banking association," and therefore is not exempt from state usury laws under 12 U.S.C. §85.

173.    The Dealership has obscured the actual rate of interest charged and the total amount financed by hiding additional interest as costs within the purchase.

174.    In reality, the increase in the cash price of the vehicle and/or the cost of the additional mandatory products and charges are finance charges that should have been disclosed as such in the contract.

175.    When these charges are added to the incomplete finance charge, the total finance charge is actually approximately more than $30,000 higher than reported, and the interest rate for this loan is well over 16%.

176.    Pursuant to NYGOL § 5-501, the alleged interest is therefore usurious, and the creditor forfeits both principal and interest due on the transaction.

177.    As a result of Defendants' violations, Plaintiffs are entitled to a declaratory judgment that their obligation to SCUSA, the assignee of the loan made by the Dealership, is void, and are entitled to damages in the amount of all principal, interest, fees and other charges paid on the auto loan to date.

## COUNT VI
## FRAUD

178.    Plaintiffs re-allege and incorporate by reference the foregoing paragraphs.

179.    Defendants intentionally and fraudulently induced Plaintiffs to enter into a retail installment contract requiring Plaintiffs to borrow more than $13,000 than was originally agreed with the false representation that the vehicle could only be purchased and financed through the Dealership if Plaintiffs purchased additional products required by the lender.

180. Plaintiffs justifiably relied upon each of Defendants' misrepresentations of material facts, as a result of which they sustained losses and damages.

181. Had Plaintiffs not been misled by Defendants, they never would have agreed to a vehicle purchase transaction obligating them to pay off a vehicle purchase cost that is more than $13,000 higher than advertised.

182. As part of Defendants' fraudulent scheme, Dealership employees or agents falsely promised Plaintiffs that they would be able to refinance the loan with the dealership after 4 payments to SCUSA of $624.12 per month and lower their monthly payments to $155.27 after refinancing.

183. Plaintiffs justifiably relied upon each of Defendants' misrepresentations of material facts described in paragraph 182 above, as a result of which they have sustained losses and damages.

184. As a further part of Defendants' fraudulent scheme, Dealership employees and agents falsely promised Plaintiffs that the Dealership would arrange refinancing of the vehicle loan with Bank of America, including monthly payments of $74.06, for a fee of $3000.

185. The Dealership has not arranged any refinancing despite having received the $3000 from Plaintiffs.

186. Plaintiffs justifiably relied upon each of Defendants' misrepresentations of material facts described in paragraph 184 above, as a result of which they have sustained losses and damages.

187. As a result of Plaintiffs' reasonable reliance upon Defendants' misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial and is entitled to actual and punitive damages, attorneys fees, and costs and expenses.

**COUNT VII**
**NYGBL § 349 (Deceptive Acts and Practices Unlawful)**
(Related to the Refinancing Scam)

188.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

189.   Defendants acts and practices set forth above, also constitute violations of NYGBL §

349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of

a service in this state, unlawful, independent of whether these acts and practices constitute

violations of any other law.

190.   These deceptive acts and practices were committed in conduct of business, trade,

commerce or the furnishing of a service in this state.

191.   Each of these actions was consumer oriented and involves misleading conduct that is

recurring and has a broad impact upon the public, or, in the alternative, such misleading practices

are the types that could easily recur, could potentially impact similarly situated consumers, and

are therefore consumer-oriented and harmful to the public at large.

192.   Specifically, upon information and belief, Defendants routinely induce customers into

more expensive credit obligations with the false promise that the consumer will be able to

refinance the obligation and receive significantly reduced monthly payments following the

payment of the first few monthly payments.

193.   As occurred in Plaintiffs' case, when consumers return to refinance with the dealership,

the Dealership routinely requires consumers to pay additional funds in order to obtain

refinancing, even though the dealership has no intention of arranging any such refinancing.

194.   And as also occurred in Plaintiffs' case, Defendants routinely prepare false retail

installment contracts to lead consumers to believe that they are receiving refinancing for their

loan in exchange for their cash payment.

195.   Upon information and belief, these false and deceptive consumer oriented actions result in all Defendants receiving payments from the transaction that are higher than if the false and deceptive actions were not employed.

196.   Defendants' conduct and statements were materially misleading.

197.   As a result of these violations of NYGBL §349, Plaintiffs suffered pecuniary and non-pecuniary harm.

198.   Upon information and belief, Defendants' violations were willful and knowing and committed in bad faith.

199.   For these reasons, Plaintiffs are entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

### COUNT VIII
### NYGBL § 349 (Deceptive Acts and Practices Unlawful)
(Related to Forcing Consumers to Purchase Service Contracts, Insurance and other Products)

200.   Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

201.   Defendants acts and practices set forth above, also constitute violations of NYGBL § 349, which makes deceptive acts in the conduct of business, trade, commerce or the furnishing of a service in this state, unlawful, independent of whether these acts and practices constitute violations of any other law.

202.   These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

203.   Each of these actions was consumer oriented and involves misleading conduct that is recurring and has a broad impact upon the public, or, in the alternative, such misleading practices are the types that could easily recur, could potentially impact similarly situated consumers, and are therefore consumer-oriented and harmful to the public at large.

29

204.     Upon information and belief, the Dealership routinely induce customers to purchase warranties and service contracts and insurance products by falsely representing that such purchases are required by the banks and finance companies to which the subject loans will be assigned.

205.     Upon information and belief, these false and deceptive consumer oriented actions result in all Defendants receiving payments from the transaction that are higher than if the false and deceptive actions were not employed.

206.     Defendants' conduct and statements were materially misleading.

207.     As a result of these violations of NYGBL §349, Plaintiffs suffered pecuniary and non-pecuniary harm.

208.     Upon information and belief, Defendants' violations were willful and knowing and committed in bad faith.

209.     For these reasons, Plaintiffs are entitled to actual damages, three times the actual damages up to $1000, costs and reasonable attorneys fees pursuant to NYGBL § 349(h), and declaratory judgment that Defendants' practices are deceptive as defined under § 349.

## COUNT IX
### NYGBL § 350 (Unlawful False Advertising)

210.     Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

211.     Each of the acts and practices set forth above, also constitute violations of NYGBL § 350, which makes false advertising unlawful, independent of whether these acts and practices constitute violations of any other law.

212.     This false advertising was committed in the conduct of business, trade, commerce or the furnishing of a service in this state.

213. Under NYGBL § 350, "false advertising" means "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual."

214. The Vehicle was advertised on www.newyorkmotorgroup.com for $14,900. This online ad for the vehicle is "advertising," as defined by NYGBL§ 350.

215. Specifically, Defendants falsely advertised the vehicle's price because they hid the true cost to the consumer of purchasing the car. Defendants did so by increasing the sales price of the vehicle from the amount advertised by adding "mandatory" products, charges, and service contracts.

216. Defendants' placing an online ad with a listed price of $14,900, followed by a false negotiation in which Defendant represented to Plaintiffs that the sale price was in fact $14,900, then followed by insisting that amounts had to be added to the price and certain warranties, service contracts, insurance had to be purchased for thousands of dollars over and above the stated price in order to obtain financing, taken together, represent the Defendants' false advertising.

217. Defendants' false advertising was done knowingly and willfully and committed in bad faith.

218. As a result of Defendants' false advertising in violation of NYGBL § 350, Plaintiffs suffered actual damages including but not limited to the cost of the warranties, "insurance,"

service contracts, and added charges that were not included in the advertised price but they were forced to purchase.

219.    For these reasons, Plaintiffs are entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350-e.

## COUNT X
## RESCISSION/MISTAKE

220.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

221.    As alleged herein (see Count of Fraud, *supra*) Defendants have committed fraudulent acts and made fraudulent representations to Plaintiffs.

222.    Based on Defendants fraud and misrepresentations, Plaintiffs' executions of all Retail Installment Contracts are founded upon material mistake.

223.    As a result of Defendants' fraud and misrepresentations and Plaintiffs' resulting material mistake, Plaintiffs have sustained damages.

224.    Because Plaintiffs have consistently sought to resolve this dispute and receive a refund of all charges that were not disclosed to them until after the sale, there can be no claim of laches.

225.    Plaintiffs are ready, willing and able to restore the parties to the position each occupied prior to the execution of the subject agreements, providing that Defendants return all the money paid by Plaintiffs in connection with this transaction and otherwise restore Plaintiff to the status quo ante.

226.    Plaintiffs have no remedy at law.

227.    By reason of the foregoing, Plaintiffs are entitled to a judgment rescinding and setting aside all Retail Installment Contracts and all service contracts and insurance products, and directing the return to them of all money paid in connection with this transaction.

## COUNT XI
## BREACH OF CONTRACT

228.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

229.    Moreover, Defendants contracted with Plaintiffs to refinance their loan for a fee of $3,000.

230.    Plaintiffs have paid the $3,000 fee but have not received refinancing and the lower monthly payments that were promised.

231.    Defendants have received the $3000 fee but have not provided Plaintiffs with the promised refinancing and lower monthly payments.

232.    As a result of Defendants failure to deliver what they promised in exchange for a payment that has been received and retained, Defendants have breached their contract with Plaintiffs.

233.    In addition, Plaintiffs agreed to purchase the insurance for $5,500 from the Dealership on reliance of the Dealership's promise that it was required by SCUSA and he would provide full coverage and liability for both the subject vehicle and plaintiffs 98 Plymouth for 5 years without the need for any additional premium payments.

234.    After several months delay, Plaintiffs were finally provided insurance that did not include full coverage and liability for both vehicles and required monthly premium payments.

235.    Plaintiffs promptly cancelled the insurance policy and demand a refund of the $5,500.00 dollars.

236.    To date plaintiffs have only received a check for $248.20 which represents a refund of one-month's premium payment for the month of September 2013.

237.    They have not received the balance of their $5,500 payment or been given any indication that the amount has been credited to the principal of their loan balance with SCUSA.

33

238.    Defendants have received the purchase price for the Insurance, but Plaintiffs have not received what they bargained for and instead have continued to pay additional fees for their own insurance.

239.    As a result of Defendants failure to deliver what they promised in exchange for an "insurance" payment that has been received and retained, Defendants have breached their contracts with Plaintiffs.

240.    As a result of Defendants' breaches, Plaintiffs have been damaged in the amount of more than $8,500 plus other amounts to be determined at trial, and is entitled to actual damages, attorneys fees, and costs and expenses.

## COUNT XII
## NEGLIGENT HIRING, RETENTION, TRAINING, AND SUPERVISION

241.    Plaintiffs repeat and re-allege and incorporate by reference the foregoing paragraphs.

242.    The Dealership and Defendant Mamdoh Eltouby failed to exercise reasonable care in selecting, instructing and supervising the employees and/or agents it hired to sell motor vehicles and arrange vehicle purchase loans.

243.    The Dealership's and Mr. Eltouby's agents and employees acted willfully, unlawfully and in an intentionally fraudulent manner towards Plaintiffs as set forth herein.

244.    Upon information and belief, at all times Defendants Julio Estrada and Nada Eltouby were subject to the Dearelship's and Mr. Eltouby's direct supervision and control.

245.    The Dealership and Mr. Eltouby knew or should have known of the other Defendants' propensity to commit the unlawful acts described herein or should have known of such propensity had they conducted an adequate hiring procedure.

246.    The Dealership and Mr. Eltouby do not properly train or supervise the employees and/or agents they use to sell vehicles and arrange for vehicle financing.

247.   Indeed, upon information and belief, the Dealership and Mr. Eltouby train their

employees and/or agents to violate state and federal consumer and other laws.

248.   The Dealership and Mr. Eltouby owed a duty of care to Plaintiff that its employees and

agents would act in accordance with state and federal laws.

249.   As a direct result and proximate cause of Defendant NY Medical and Dr. Golyan's

employees and/or agents' unreasonable, unfair, illegal and fraudulent conduct, Plaintiffs have

suffered harm including, without limitation, the damages set forth in Counts I-XI, above.

250.   As a result of the foregoing, Plaintiffs are entitled to actual and punitive damages, and

reasonable costs.

WHEREFORE Plaintiff respectfully demands judgment against Defendants as follows:

a.   On COUNT I and II, TRUTH IN LENDING ACT, 15 §§1601 et seq. ("TILA"),
judgment against Defendants for statutory damages, actual damages, attorney's fees,
litigation expenses and costs, declaratory judgment that they have violated TILA and
Regulation Z, and such other or further relief as the Court deems appropriate;

b.   On COUNT III, VIOLATIONS OF RICO, judgment against Defendants for
compensatory and treble damages in an amount to be determined at trial, and a
prospective order directing Defendants to disgorge their ill-gotten gains in order to
deter them from engaging in similar conduct in the future;

c.   On COUNT IV VIOLATIONS OF MVRISA, declaratory judgment against
Defendants that they have violated MVRISA and ordering the cancellation of the
Second RIC and restitution of all funds paid under the Second RIC.

d.   On COUNT V VIOLATIONS OF NEW YORK CIVIL USURY LAWS, declaratory
judgment that Plaintiffs' obligation to SCUSA, the assignee of the loan made by
Defendants, is void, actual damages in the amount of all principal, interest, fees, and
charges paid and such other and further relief as the Court deems appropriate;

e.   On COUNT VI, FRAUD, judgment against Defendants, actual damages, punitive
damages, costs and reasonable attorneys fees;

f.   On COUNT VII and COUNT VIII, NYGBL § 349, judgment against Defendants,
injunctive relief, actual damages, three times the actual damage up to $1,000, costs
and reasonable attorneys fees pursuant to NYGBL § 349(h), declaratory judgment

that Defendants have violated NYGBL § 349 and such other and further relief as the Court deems appropriate;

g. On COUNT IX NYGBL § 350, judgment against Defendants, injunctive relief, actual damages, three times the actual damages up to $10,000, costs and reasonable attorneys fees pursuant to NYGBL § 350(e), declaratory judgment that Defendants' have engaged in false advertising and such other or further relief as the Court deems appropriate;

h. On COUNT X RESCISSION/MISTAKE, judgment rescinding and setting aside the Retail Installment Contract and service contract, and directing the return to Plaintiff of all money paid in connection with this transaction;

i. On COUNT XI BREACH OF CONTRACT, judgment against Defendants for actual damages, costs and reasonable attorneys fees;

j. On COUNT XII, NEGLIGENT HIRING RETENTION AND TRAINING, judgment against Defendants for actual damages, punitive damages and reasonable costs.

k. Such other and further relief as law or equity may provide.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: December 23, 2013
New York, New York

Respectfully Submitted,

Peter T. Lane, Esq.
Schlanger & Schlanger, LLP
*Attorneys for Plaintiff*
9 East 40th Street, Suite 1300
New York, NY 10016
Ph:  914-946-1981, ext. 109
peter.lane@schlangerlegal.com

36

# EXHIBIT A

SIMPLE FINANCE CHARGE

Dealer Number: ___ Contract Number: ___

Buyer (and Co-Buyer) Name and Address (Including County and Zip Code)
**BONER F FREIRE**
**22 ZABRISKIE ST #2**
**JERSEY CITY NJ 07307**

Creditor - Seller (Name and Address)
**Planet Motor Cars Inc**
**160-14 Hillside Avenue**
**Jamaica, NY 11432**

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2010 | HONDA ODYSSEY | 5FNRL3H02AB064438 | ☑ personal, family or household ☐ business ☐ agricultural |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $10,500.00 |
|---|---|---|---|---|
| 20.74 % | $ 14,447.24 | $ 22,999.96 | 37,447.20 | 47,947.20 |

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments |
|---|---|
| 60 | 624.12 |

Or As Follows:

Late Charge. ...
Prepayment. ...
Security Interest. ...

**ITEMIZATION OF AMOUNT FINANCED**

1. Cash Price (including $ 2,471.96 sales tax) ... $ 30,199.96 (1)
2. Total Downpayment =
   - Trade-In _____ (Year) (Make) (Model)
   - Gross Trade-In Allowance $ N/A
   - Less Pay Off Made By Seller $ N/A
   - Equals Net Trade In $ 0.00
   - + Cash $ 10,500.00
   - + Other $ N/A
   (If total downpayment is negative, enter "0" and see 4I below) $ 10,500.00 (2)
3. Unpaid Balance of Cash Price (1 minus 2) $ 19,699.96 (3)
4. Other Charges Including Amounts Paid to Others on Your Behalf (Seller may keep part of these amounts):
   - A. Cost of Optional Credit Insurance
     - Life $ N/A
     - Disability $ N/A $ N/A
   - B. Vendor's Single Interest Insurance
     - Paid to Insurance Company $ N/A
   - C. Other Insurance Paid to the Insurance Company $ N/A
   - D. Fees Paid to Government Agencies
     - to _____ for _____ $ N/A

**Other Insurance** N/A
Type of Insurance ___ Term ___
Premium $ N/A
Insurance Company Name ___
Home Office Address ___

I want the insurance checked above.

| | | | | | |
|---|---|---|---|---|---|
| to | for | | $ | N/A | |
| E | Government Taxes Not Included In Cash Price | | $ | N/A | |
| F | Government License and/or Registration Fees | | $ | N/A | |

**X**
Buyer Signature                                    Date

| | | | | |
|---|---|---|---|---|
| G | Government Certificate of Title Fees | $ | 900.00 | |
| H | Government Waste Tire Management Fee | $ | 0.00 | |
| I | Other Charges (Seller must identify who is paid and describe purpose) | $ | 0.00 | |

**X**
Co-Buyer Signature                                  Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

| | | | | |
|---|---|---|---|---|
| to | for Prior Credit or Lease Balance | $ | N/A | |
| to | for **Doc Fee** | $ | 0.00 | |
| to | for **Vehicle Service Contract** | $ | 3,000.00 | |
| to | for | $ | N/A | |
| to | for | $ | N/A | |
| to | for | $ | N/A | |
| **Total Other Charges and Amounts Paid to Others on Your Behalf** | | $ | 3,900.00 | |
| **5** | **Amount Financed (3 + 4)** | $ | 22,999.96 | |

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI Insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the insurance company through which the VSI insurance is obtained. If you elect to purchase VSI insurance through the Creditor, the cost of this insurance is $ N/A and is also shown in Item 4B of the ITEMIZATION OF AMOUNT FINANCED. The coverage is for the initial term of the contract.

Returned Check Charge: You agree to pay a charge of $ 20 if any check you give us is dishonored.

OPTION: ☐ You pay no finance charge if the amount financed, item 5, is paid in full on or before _____ , Year _____   SELLERS INITIALS _____

## NO COOLING OFF PERIOD
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.   Buyer Signs **X** _____   Co-Buyer Signs **X** _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
**See back for other important agreements.**

**NOTICE TO BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of the agreement. 3. Under the law, you have a right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under certain circumstances obtain a rebate of the credit service charge. 4. According to law, you have the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of your own selection.**
**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.**
**RETAIL INSTALMENT CONTRACT**

Buyer Signs **X** _____   Date FEB/19/2013   Co-Buyer Signs **X** _____   Date _____
Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. Another owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here **X** _____
Seller signs _____   Date FEB/19/2013   By **X** _____   Title _____

Seller assigns its interest in this contract to **santander consumer funding 3 llc** (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse   ☐ Assigned without recourse   ☐ Assigned with limited recourse

Seller **Planet Motor Cars Inc**   By _____   Title _____

**AW** FORM NO. 553-NY (REV. 6/03) U.S. PATENT NO. D460,762
©2003 Reynolds and Reynolds. TO ORDER: www.reyrey.com 1-800-344-0996; fax 1-800-531-9055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CUSTOMER/TRUTH-IN-LENDING

1. **FINANCE CHARGE AND PAYMENTS**
   a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.
   b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.
   c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.
   d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

2. **YOUR OTHER PROMISES TO US**
   a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.
   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
   c. **Security Interest.**
      You give us a security interest in:
      • The vehicle and all parts or goods installed in it;
      • All money or goods received (proceeds) for the vehicle;
      • All insurance, maintenance, service, or other contracts we finance for you; and
      • All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
      This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.
   d. **Insurance you must have on the vehicle.**
      You agree to have physical damage insurance

If you pay late, we may also take the steps described below.
   b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once subject to any right you have to reinstate the contract for less (see below). Default means:
      • You do not pay any payment on time;
      • You start a proceeding in bankruptcy or one is started against you or your property; or
      • You break any agreements in this contract.
   The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Prepaid Finance Charge and the Finance Charge, any late charges, and any amounts due because you defaulted.
   c. **You may have to pay collection costs.** If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. The maximum attorney's fee you will pay will be 15% of the amount you owe.
   d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.
   e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back. If two things are true, you have the right to get the vehicle back by paying all past due payments, any late charges, and any expenses we incurred related to retaking the vehicle, holding it, and preparing it for sale (reinstate). First, you must have bought the vehicle primarily for personal, family, or household use. Second, your only default is a failure to pay an instalment payment on time. Otherwise, we will tell you how much to pay to get the vehicle back. Your right to get the vehicle back ends when we sell it.
   f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
   We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.
   g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance

covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e. What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

---

**3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

**a. You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

service, or other contract on the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**4. WARRANTIES SELLER DISCLAIMS**

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide or limit any rights you may have under the Lemon Laws.

---

**5. Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**

**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

---

**6. Applicable Law**

Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-NY 8/05

# EXHIBIT B

Technology Insurance Company, Inc.

A Stock Company
59 Maiden Lane, 6th Floor
New York, NY 10038

**Theft Deterrent Product Protection**

Certificate
Under Master Policy # TIC-NSD-Y...-0401...
Issued to
Nation Safe Drivers
800 Yamato Road, Suite 100
Boca Raton, FL 33431

Certificate Effective Date:     Month          Day          Year

| GROUP MEMBER | | DEALER | | CODE# | |
|---|---|---|---|---|---|
| BORIS P FREIRE | | Planet Motor Cars Inc | | | |
| Address | | Address | | | |
| 22 ZABRISKIE ST #2 | | 180-14 Hillside Avenue | | | |
| City | State | Zip | City | State | Zip |
| JERSEY CITY | NJ 07307 | | Jamaica, NY 11432 | | |
| Home Phone | Bus. Phone | | Phone | Contact | |
| 201-744-9253 | 201-332-2677 | | | | |
| Year 2010 | Make HONDA | Model ODYSSEY | VIN# 5FNRL3H62AB08445 | Mileage/Hours | 61744 |

| FINANCIAL AGREEMENT | | LENDER/LESSOR | | |
|---|---|---|---|---|
| | | santander consumer funding 3 llc | | |
| Loan   Lease | Term (Months) 60 | Vehicle Purchase Price 14,900.00 | Address | |
| Etch Price $ | Vehicle Price $ 14,900.00 | City | State | Zip |

**FOR INSURANCE COMPANY USE ONLY**

**Coverage Period: 5 years                    Maximum Limit of Liability: $25,000**

**LOSS BENEFIT**

In the event the Theft Deterrent Product (TDP) applied to or installed on the Covered Vehicle specified in this Certificate fails to prevent the Covered Vehicle from being stolen and such failure results in a Total Loss as described herein, We will pay the original selling dealer, as listed above, or an Authorized Dealer on Your behalf up to twenty five thousand dollars ($25,000), towards Your purchase or lease of a Replacement Vehicle. The Loss Benefit payable to You shall be calculated as follows:

  i) Purchased Vehicle – The difference between Your Replacement Vehicle Cost and the amount You receive from Your Primary Automobile Insurance Carrier for the theft of Your Covered Vehicle; or

  ii) Leased Vehicle – The total payment due the original selling dealer or an Authorized Dealer, where such payment will reduce Your Replacement Vehicle Cost to the amount necessary, to produce a Replacement Vehicle monthly lease payment and term (total number of monthly payments) which is identical to that of the original monthly lease payment and term for Your Covered Vehicle.

Our Maximum Limit of Liability or the maximum amount payable under this Certificate is twenty five thousand dollars ($25,000).

**DEFINITIONS**

For the purpose of this Certificate the following terms shall mean:

- **Administrator, Master Policyholder** means the company listed above the application section of this Certificate who manufacturers or distributes a TDP and administers this Certificate.
- **Authorized Dealer** means an automobile dealer appointed by the Administrator in certain circumstances where You cannot return to the original selling dealer as listed above to purchase or lease a Replacement Vehicle.
- **Certificate** means a document issued to You which specifies the definitions, exclusions, terms and conditions of the coverage.
- **Certificate Effective Date** means the date You purchased the TDP and the date this Certificate begins.
- **Certificate Holder, You, Your** means the purchaser of the Covered Vehicle as listed in the application section of this Certificate. It also means an individual who has purchased the Covered Vehicle from the original Certificate Holder and has formally transferred the Certificate by written request to the Administrator within fifteen (15) days.
- **Coverage Period** means the period of time that this Certificate shall be in effect from the Certificate Effective Date until the earlier of the expiration of the Coverage Period or until We have made a claim payment under this Certificate.
- **Covered Vehicle** means the four-wheeled personal passenger vehicle, van, pickup or a light truck or recreational vehicle, as listed in the application section of this Certificate which has had the TDP applied to or installed and for which You have paid a premium to the Administrator.
- **Date of Loss** means the date on which the theft of the Covered Vehicle occurred. If such date is not determinable, the Date of Loss shall either be the date established by the Primary Automobile Insurance Carrier or the date the theft was reported to the police, whichever is earlier.
- **Policy Territory** means the continental United States of America, its territories or possessions and Canada.
- **Replacement Vehicle** means the vehicle You purchase or lease under the terms of this Certificate as a replacement for Your Covered Vehicle. The Replacement Vehicle must be the same make and model with similar factory options as Your Covered Vehicle as of the Certificate Effective Date. The Replacement Vehicle must be the same number of model years old as Your stolen Covered Vehicle as of the Certificate Effective Date. (Example: If You purchase a 1993 vehicle in 1996 (a vehicle which is four (4) model years old) and it is stolen, deemed a Total Loss due to theft, and unrecovered in 1998, Your Replacement Vehicle will be a 1995 model year vehicle (a vehicle which is four (4) model years old). You must be the person who purchases or leases the Replacement Vehicle.
- **Replacement Vehicle Cost** means the sales price, or in the case of a leased vehicle, the gross capitalized cost, of Your Replacement Vehicle, not to exceed the Manufacturer's Suggested Retail Price (MSRP), plus sales tax, title, fees, and any O.E.M. equipment sold at the dealer level at time of purchase. If on the Certificate Effective Date Your Covered Vehicle is a used vehicle (a vehicle with an odometer of over twenty four thousand (24,000) miles or more than two (2) model years old, or registered or licensed to a previous purchaser), the Replacement Vehicle Cost shall be the retail value listed for Your Covered Vehicle in the National Automobile Dealers Association (NADA) Official Used Car Buying Guide published in the calendar quarter of the year that You obtain the Replacement Vehicle and shall cover the geographical region in which You obtain Your Replacement Vehicle.
- **Total Loss** means Your Primary Automobile Insurance Carrier has declared the Covered Vehicle a Total Loss as a direct result of theft.
- **We, Us, Our** means the Insurance Company issuing this Certificate and is listed above the application section of this Certificate.
- **Stolen Vehicle** means the Covered Vehicle shall be considered stolen for purposes of a Loss Benefit under this Certificate after the occurrence of the following: 1) You must have reported the theft within fifteen (15) days to the police having jurisdiction of the matter and to the Administrator named on the Certificate within forty five (45) days of the theft; 2) Thirty (30) days must have passed after the Date of Loss with the Covered Vehicle having not been recovered or, if recovered, is declared a Total Loss by Your Primary Automobile Insurance Carrier, and 3) You must have comprehensive physical damage insurance in effect with a Primary Automobile Insurance Carrier and must receive an insurance claims settlement by reason of the un-recovered theft or declaration that Your Covered Vehicle is a constructive Total Loss.

**THIS PRODUCT DOES NOT AFFORD PROTECTION AGAINST BODILY INJURY OR PROPERTY DAMAGE, NOR DOES IT FULFILL THE FINANCIAL RESPONSIBILITY LAWS. THIS PRODUCT DOES NOT ELIMINATE THE NEED FOR AN AUTOMOBILE INSURANCE POLICY.**

FEB/19/2013                                    NSD1304743

| Signature of Certificate Holder | 2/19/13 | Signature of Dealer | 2-19-2013 |
|---|---|---|---|
| | Date | | Date |

NY Veh Repl_25,000_12/11          White - Administrator          Yellow - Dealer          Pink - Customer          293

TERMS AND ... TIONS applies only to a loss that occurs within the **Policy Territory**.
A) This **Coverage Period** commences on the **Certificate Effective Date** and continues for five (5) years, unless otherwise terminated in accordance with this **Certificate**.
B) ...
C) **You** must purchase and maintain for the full **Coverage Period** of this **Certificate**, comprehensive physical damage insurance on the **Covered Vehicle** for limits at least equal to the actual cash value of the **Covered Vehicle**. Failure to do so will void this **Certificate**.
D) Since the TDP is permanently installed on the **Covered Vehicle**, this **Certificate** is noncancelable and nonrefundable.
E) **You** may transfer this **Certificate** at the time **You** sell **Your Covered Vehicle**, by sending a written request to the **Administrator** within fifteen (15) days of the **Covered Vehicle** resale date. Copies of new registered title and bill of sale must accompany the transfer request.
F) No **Administrator** will, except at that **Administrator's** own cost, voluntarily make a payment, assume an obligation, or incur any expense without **Our** consent.
G) When **We** make a payment for a **Loss Benefit** under this **Certificate** for the **Covered Vehicle**, coverage under this **Certificate** will cease and will cause this **Certificate** to expire.

## DUTIES IN THE EVENT OF LOSS
**You** must see that the following are done in the event of loss:
1. Give the **Administrator** prompt notice of the loss. Include a description of the **Covered Vehicle** involved.
2. If requested, permit the **Administrator** to question **You** under oath, at such times as may be reasonably required, about any matter relating to this **Certificate** or **Your** claim, including **Your** books and records. In such event, **Your** answers must be signed.
3. Promptly send the **Administrator** any legal papers or notices received concerning the loss.
4. Cooperate with the **Administrator** in the investigation or settlement of the claim.

## CLAIM REQUIREMENTS
**You** must report the theft of the **Covered Vehicle** to law enforcement authorities within twenty four (24) hours of knowledge of the theft. **You** must provide the following information to the **Administrator** within fifteen days (15) days after the **Date of Loss** has been confirmed by the primary carrier to:
NIU of Florida, Inc., 800 Yamato Road, Suite 100, Boca Raton, FL 33431; (888) 684-9327
Documentation must include:
1. Copy of this **Certificate**;
2. Copy of police report evidencing the **Covered Vehicle** reported as stolen;
3. Copy of the original buyer's order for the **Covered Vehicle**;
4. Verification from **Your** Primary Automobile Insurance Carrier substantiating the date and cause of loss and a copy of the settlement check;
5. Copy of the purchase or lease agreement for the **Replacement Vehicle**; and
6. Dealer invoice or equivalent stating the factory options and accessories affixed to the **Replacement Vehicle** at the time of delivery.

**Your** claim cannot be processed until the **Administrator** has received all of the above in fully legible form. Upon receipt and validation of a **Total Loss** by the **Administrator**, a letter confirming the payable benefit will be sent to **You** and either the original dealer or **Authorized Dealer** which states payment will be made when proof of purchase and delivery of the **Replacement Vehicle**, is provided.

## LOSS PAYMENT
We will pay or make good on any **Total Loss** covered under this **Certificate** within thirty (30) days after: (1) **You** have fully complied with all of the terms and conditions of this **Certificate**; and (2) **You** have provided the **Administrator** satisfactory documentation concerning the **Total Loss**; and (3) **We** reach an agreement with **You**.

## EXCLUSIONS
We will not pay a **Loss Benefit**:
1. For any loss resulting directly or indirectly from any dishonest, fraudulent or criminal act by **You** and/or **Your** family members.
2. For any loss or damage resulting from war, whether or not declared, invasion, civil war, insurrection, rebellion, or revolution, nuclear radiation or radioactive contamination.
3. For any loss if no comprehensive physical damage coverage is in effect with a Primary Automobile Insurance Carrier on the **Date of Loss**.
4. For any loss resulting from theft occurring prior to the **Certificate Effective Date**.
5. For personal property located in or on the **Covered Vehicle**.
6. If **Your Covered Vehicle** is recovered within thirty (30) days of the **Date of Loss** and is not ruled a **Total Loss** by **Your** Primary Automobile Insurance Carrier.
7. For any loss when **Your** Primary Automobile Insurance Carrier has not paid or refuses to pay any monies for the theft of **Your Covered Vehicle**.
8. Where coverage is duplicated.
9. For any **Total Loss** when **You** do not provide notice to the **Administrator** within fifteen (15) days of the **Date of Loss** or provide necessary documentation to the **Administrator** within forty five (45) days from the **Date of Loss**.

## SUBROGATION
In the event of any payment under this **Certificate**, **We** shall be subrogated to all **Your** rights of recovery therefore against any person or organization and **You** will cooperate in securing such rights. **You** shall do nothing after the **Total Loss** to prejudice such rights.

## EXCESS INSURANCE:
Coverage under this **Certificate** is excess insurance over any other insurance or indemnity. Coverage shall not be treated as contributing with any other insurance or indemnity whether or not such insurance is collectible.

## ARBITRATION
If **We** and **You** disagree on any respect of a provision of this **Certificate**, or a claim under this **Certificate**, the following provisions apply: 1) Either party may make a written demand for arbitration of the dispute; 2) The arbitration will be executed pursuant to the rules and procedures of the American Arbitration Association; 3) There shall be three (3) arbitrators. Each of us will select the one from the list of five or more candidates supplied by the American Arbitration Association. If the two (2) arbitrators cannot agree on an umpire, the final decision as to the selection of the umpire will be left to the American Arbitration Association; 4) Any findings of fact, or conclusion of law, or award, which are agreed upon by the umpire and one of the arbitrators will be binding; 5) Time limitations in the Claims Reporting and Settlement and Suit Conditions will be tolled from the date of a written arbitration demand until the issuing of any findings as described in (4) above; 6) In the case of an arbitration demand by Us, We will pay all cost and expenses of the proceedings, the umpires' fees and the fees of the other two (2) arbitrators. We will not pay legal fees, or consultant fees, incurred by **You**; 7) In the case of an arbitration proceeding demanded by **You**, **We** will share the cost and expenses of the proceedings and the fees of the umpire. Each of us will pay the fee of the arbitrator selected by ourselves.

## EXAMINATION UNDER OATH
The **Administrator** and **You** shall submit, and so far as is within his, her, or their power, shall cause all other persons interested in the loss and members of the household and employees to submit to examinations under oath by any persons named by Us, relative to any and all matters in connection with a claim. The **Administrator** and **You** shall produce all books of account, bills, invoices, and other vouchers or certified copies thereof if originals are lost, at such reasonable time and place as may be designated by Us and shall permit extracts and copies thereof to be made.

## LEGAL ACTION AGAINST US
No one may bring legal action against Us or the **Administrator** under this **Certificate** unless: 1) There has been full compliance with all of the terms of this **Certificate**; and 2) The action is brought within six (6) years after the loss.

## CANCELLATION OF THE MASTER POLICY
In the event the master policy is cancelled and provided **Your Certificate Effective Date** is prior to the cancellation date of the master policy and **Your** premium has been submitted to Us, cancellation of the master policy shall not affect **Our** duties or rights, or the duties or rights of the **Administrator**, Master **Policyholder**.

# EXHIBIT C

## SIMPLE FINANCE CHARGE

Dealer Number _____   Contract Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| BORIS P. FREIRE<br>22 ZABRISKIE ST #2<br>JERSEY CITY NJ 07307 | MIRIAM J OSORIO<br>22 ZABRISKIE ST #2<br>JERSEY CITY, NJ 07307 | D L R<br>S.R.V.S |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2010 | HONDA ODYSSEY | 5FNRL3H62AB064439 | ☒ personal, family or household<br>☐ business<br>☐ agricultural |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $3,000.00 is |
|---|---|---|---|---|
| 8.77% | $ 6,800.32 | $ 15,500.00 | $ 4,000.32 | $ 7,000.32 |

**Your Payment Schedule Will Be:**

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 54 | 74.08 | Monthly beginning 04/05/2013 |

Or As Follows:

**Late Charge.** If payment is not received in full within __10__ days after it is due, you will pay a late charge of __5__ % of the part of the payment that is late. If the vehicle is primarily for personal, family, or household use and the cash price is $ __10,000__ or less, the charge for each late payment will be $ __10__.

**Prepayment.** If you pay off all your debt early, you will not have to pay a penalty.

**Security Interest.** You are giving a security interest in the vehicle being purchased.

**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash Price (including $ 1,100.00 sales tax) | | $ 16,500.00 (1) |
| 2 Total Downpayment = | | |
| Trade-In | | |
| (Year)     (Make)     (Model) | | |
| Gross Trade-In Allowance | $ N/A | |
| Less Pay Off Made by Seller | $ N/A | |
| Equals Net Trade In | $ 0.00 | |
| + Cash | $ 3,000.00 | |
| + Other | $ N/A | |
| (If total downpayment is negative, enter "0" and see 4J below) | $ 3,000.00 (2) | |
| 3 Unpaid Balance of Cash Price (1 minus 2) | | $ 15,500.00 (3) |
| 4 Other Charges Including Amounts Paid to Others on Your Behalf: | | |
| (Seller may keep part of these amounts): | | |
| A Cost of Optional Credit Insurance Paid to Insurance Company or Companies | | |
| Life | $ N/A | |
| Disability | $ N/A | $ N/A |
| B Other Optional Insurance Paid to Insurance Company or Companies | | $ N/A |
| C Official Fees Paid to Government Agencies | | |
| to _____ for _____ | $ N/A | $ N/A |

---

**Insurance.** You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below.

### Optional Credit Insurance

☒ Credit Life:     ☐ Buyer   ☐ Co-Buyer   ☐ Both
☒ Credit Disability (Buyer Only)

Premium:
Credit Life $ _____ N/A
Credit Disability $ _____ N/A

Insurance Company Name: _____

Home Office Address: _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance pays the unpaid part of the amount financed if you die. This insurance pays only the amount you would owe if you paid all your payments on time. Credit disability insurance pays the scheduled payments due under this contract while you are disabled. This insurance does not cover any increase in your payment or in the number of payments. The policies or certificates issued by the named insurance companies may further limit the coverage that credit life or credit disability insurance provides. See the policies or certificates for coverage limits and other terms and conditions. Coverage for credit life insurance and credit disability insurance ends on the original date for the last payment unless a different term for the insurance is shown below.

### Other Optional Insurance        N/A

☐ Type of Insurance _____ Term _____
Premium $ N/A
Insurance Company Name: N/A
Home Office Address _____

☐ Type of Insurance _____ Term _____
Premium $ N/A

| | | | |
|---|---|---|---|
| to | for | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |
| D  Optional Gap Contract | | $ | N/A |
| E  Supplemental Title Fee | | $ | N/A |
| F  Vehicle Tire Fee | | $ | N/A |
| G  Government Taxes Not Included in Cash Price | | $ | N/A |
| H  Government License and/or Registration Fees | | $ | 0.00 |
| **Registration** | | | |
| I  Government Certificate of Title Fees | | $ | N/A |
| J  Other Charges (Seller must identify who is paid and describe purpose) | | | |
| to | for Prior Credit or Lease Balance | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |
| to  **D L R** | for  **Doc Fee** | $ | 0.00 |
| to | for | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |
| to | for | $ | N/A |

Total Other Charges and Amounts Paid to Others on Your Behalf       $    0.00
5   Amount Financed (3 + 4)                                          $   15,500.00  (5)

Premiums

Insurance Company Name _____

Home Office Address _____

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____
Buyer Signature                                    Date

X _____
Co-Buyer Signature                                 Date

**THIS DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE, YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.**

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, Item 5, is paid in full on or before _____, Year _____, SELLER'S INITIALS _____

**Returned Check Charge:** You agree to pay a charge of $ ___20___ if any check you give us is dishonored and the law allows it.

☐ If this box is checked, the following late charge applies to vehicles purchased primarily for business or agricultural use.
If a payment is not received in full within _____ days after it is due, you will pay a late charge of $ _____ or _____ % of the part of the payment that is late, whichever is less.
If this box is not checked, the late charge in the "Federal Truth-In-Lending Disclosures" still applies.

---

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos.                          Name of Gap Contract _____

I want to buy a gap contract.

Buyer Signs X _____

---

### NO COOLING OFF PERIOD
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

---

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

---

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.     Buyer Signs X _____     Co-Buyer Signs X _____

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

See back for other important agreements.

### NOTICE TO RETAIL BUYER

**Do not sign this contract in blank.**
**You are entitled to a copy of the contract at the time you sign.**
**Keep it to protect your legal rights.**

**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.**

Buyer Signs X _____  Date  FEB/19/2013     Co-Buyer Signs X _____ Date

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here ▶ X _____     FEB/19/2013     Address _____     Title _____

| | | | |
|---|---|---|---|
| G | Government Taxes Not Included in Cash Price | $ | N/A |
| H | Government License and/or Registration Fees | | |
| | Registration | $ | 0.00 |
| I | Government Certificate of Title Fees | $ | N/A |
| J | Other Charges (Seller must identify who is paid and describe purpose) | | |

to _____ for Prior Credit or Lease Balance $ __N/A__
to _____ for $ __N/A__
to _____ for $ __N/A__
to D L R for Doc Fee $ __0.00__
to _____ for $ __N/A__
to _____ for $ __N/A__
to _____ for $ __N/A__
to _____ for $ __N/A__
to _____ for $ __N/A__
to _____ for $ __N/A__

Total Other Charges and Amounts Paid to Others on Your Behalf $ __0.00__
5 Amount Financed (3 + 4) $ __15,500.00__ (5)

Any Gap Contract or insurance does not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost.

I want the insurance checked above.

X _____
Buyer Signature                    Date

X _____
Co-Buyer Signature                 Date

**THIS DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE. WITHOUT SUCH INSURANCE, YOU MAY NOT OPERATE THIS VEHICLE ON PUBLIC HIGHWAYS.**

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before _____, Year _____ SELLER'S INITIALS _____

**Returned Check Charge:** You agree to pay a charge of $ __20__ if any check you give us is dishonored and the law allows it.

☐ If this box is checked, the following late charge applies to vehicles purchased primarily for business or agricultural use.
If a payment is not received in full within _____ days after it is due, you will pay a late charge of $ _____ or _____ % of the part of the payment that is late, whichever is less.
If this box is not checked, the late charge in the "Federal Truth-in-Lending Disclosures" still applies.

**OPTIONAL GAP CONTRACT.** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 4D of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term _____ Mos.                    Name of Gap Contract _____

I want to buy a gap contract.

Buyer Signs X _____

**NO COOLING OFF PERIOD**
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.   Buyer Signs X _____   Co-Buyer Signs X _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
See back for other important agreements.

**NOTICE TO RETAIL BUYER**

**Do not sign this contract in blank.**
**You are entitled to a copy of the contract at the time you sign.**
**Keep it to protect your legal rights.**

**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You confirm that you received a completely filled-in copy when you signed it.**

Buyer Signs X _____   Date FEB/19/2013   Co-Buyer Signs X _____ Date

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here X _____ Address _____
Seller signs D L R   Date FEB/19/2013   By X _____   Title _____

Seller assigns its interest in this contract to **santander consumer funding 3 llc** (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse        ☐ Assigned without recourse        ☐ Assigned with limited recourse

Seller _____   By _____   Title _____

## FINANCE CHARGE AND PAYMENTS

**a. How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

**b. How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

**c. How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

**d. You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

## YOUR OTHER PROMISES TO US

**a. If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

**b. Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

**c. Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle.

**d. Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and

If you pay late, we may also take the steps described below.

**b. You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once. Default means:
- You do not pay any payment on time;
- You give false, incomplete, or misleading information on a credit application;
- You start a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

**c. You may have to pay collection costs.** If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's reasonable fee and court costs the law permits. If the vehicle is primarily for personal, family, or household use and the cash price is $10,000 or less, the maximum attorney's fee you will pay will be $100 plus 10% of the excess over $500 of the amount due when we hire the attorney.

**d. We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

**e. How you can get the vehicle back.** If we take it, if we repossess the vehicle, you may pay to get it back (redeem). We will tell you how much to pay to redeem. Your right to redeem ends when we sell the vehicle.

**f. We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

**g. What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle as the law allows. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

WARRANTIES SELLER DISCLAIMS

either buy insurance that covers your interest in the vehicle, or buy insurance that covers only our interest to the extent permitted by applicable law. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium of the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e.  **What happens to returned insurance, mainte-nance, service, or other contract charges.** If we get a refund on insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3.  **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**
    a.  **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Accep-tance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

Unless the Seller makes a written warranty, or enters into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.

This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5.  **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.

    Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

6.  **Servicing and Collection Contacts.**
    You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

7.  **Applicable Law**
    Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Form No. 553-NJ 5/10