**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
ANWAR ALKHATIB,

                Plaintiff,

    - against -

NEW YORK MOTOR GROUP LLC, et al.,

                Defendants.
-------------------------------------------------------------X
SHAHADAT H. TUHIN,

                Plaintiff,

    - against -

NEW YORK MOTOR GROUP LLC, et al.,

                Defendants.
-------------------------------------------------------------X
SIMON GABRYS,

                Plaintiff,

    - against -

NEW YORK MOTOR GROUP LLC, et al.,

                Defendants.
-------------------------------------------------------------X
BORIS FREIRE, et al.,

                Plaintiffs,

    - against -

NEW YORK MOTOR GROUP LLC, et al.,

                Defendants.

-------------------------------------------------------------X

<u>**MEMORANDUM & ORDER AND REPORT & RECOMMENDATION**</u>
**CV-13-2337 (ARR)**

**CV-13-5643 (ARR)**

**CV-13-7290 (ARR)**

**CV-13-7291 (ARR)**

```
-----------------------------------------------------------X
```
ZHENG HUI DONG,
                              Plaintiff,

          - against -                                    **CV-14-2980 (ARR)**

NEW YORK MOTOR GROUP LLC, et al.,

                    Defendants.
```
-----------------------------------------------------------X
```
NASRIN CHOWDHURY,

                    Plaintiff,

          - against -                                    **CV-14-2981 (ARR)**

NEW YORK MOTOR GROUP LLC, et al.,

                    Defendants.
```
-----------------------------------------------------------X
```
**GOLD, S., Magistrate Judge:**

## INTRODUCTION

Plaintiffs in these six related cases allege, among other things, that they were defrauded

when they purchased automobiles and obtained financing from defendants.  Plaintiffs allege

multiple causes of action, including violations of the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), the Truth in Lending Act ("TILA"), the Magnuson-Moss Warranty

Act ("MMWA"), consumer protection laws of New York, and state common law.

Plaintiffs now move for leave to file Amended Complaints to bring the claims alleged in

the related cases into conformity, to refine already asserted claims, and to address issues raised

by defendants in pre-motion submissions.  Docket Entry 71.[1]  Defendants respond by cross-

moving to dismiss the Proposed Amended Complaints pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6), in large part by arguing that the complaints fail to satisfy the

---

[1] Unless otherwise indicated, all docket entry numbers listed in the text refer to docket entries in the first of these
related cases to be filed, Alkhatib v. New York Motor Group, LLC, et al., 13-cv-2337.

pleading standard of Rule 9(b). Docket Entry 77, Docket Entry 60 in 13-cv-5643. [2] Specifically, the used car dealership defendants, New York Motor Group and Planet Motor Cars, Mamdoh Eltouby, who owns and operates them, and Nada Eltouby, who was at relevant times employed by them, seek dismissal of the RICO claims against them.[3] M&T Bank moves to dismiss the RICO, TILA, MMWA, and state law consumer protection claims asserted by plaintiffs against it. Plaintiffs have filed opposition to defendants' cross-motions and a reply in support of their original motion. Docket Entry 80, ("Pls. Reply"). The dealership defendants have filed a reply on their motion, arguing that the RICO claims, as pleaded in the proposed Amended Complaints, are legally deficient, Docket Entry 85, ("NYMG Reply"), as has M&T Bank, Docket Entry 66 in 13-cv-5643, ("M&T Bank Reply"), challenging the sufficiency of the RICO, TILA, MMWA, and state law consumer protection claims made against it.

United States District Judge Ross has referred plaintiffs' motion to amend to me for decision and defendants' cross-motions to dismiss for report and recommendation. Docket Entry 65. I heard oral argument on November 25, 2014. Docket Entries 88-89. Plaintiffs then filed a supplemental letter with a revised proposed amended complaint attached. Docket Entry 92. M&T Bank filed a letter in response. Docket Entry 75 in 13-cv-5643.

### FACTS

The facts set out below are drawn primarily from plaintiffs' Proposed Amended Complaints and are deemed true for purposes of the pending motions. Facts drawn from the

---

[2] Defendants Santander Consumer USA and Capital One Auto Finance, Inc. have settled with plaintiffs and have not submitted any motions or briefing. Dealership defendants have not submitted any briefing on the pending motions in the Tuhin matter and did not submit a letter joining in the other arguments submitted by M&T Bank or by the dealership defendants in the other cases.

[3] Although NYMG does not oppose amendment or seek dismissal of plaintiffs' non-RICO claims, individual defendants Mamdoh and Nada Eltouby challenge plaintiffs' contention that they may be held personally liable on several of plaintiffs' claims. NYMG Mem. at 14-15. Plaintiffs have indicated that they do not seek personal liability of these defendants on their claims under TILA, the New York Motor Vehicle Retail Installment Sales Act, New York General Business Law and New York's usury law, or their common law claims for fraud, breach of contract or rescission. Pls. Reply at 23.

Proposed Amended Complaint ("PAC") filed by Alkhatib explain the retail installment contract ("RIC") scheme in detail. Because the overall alleged scheme is similarly described in the remaining complaints, the discussion of the pleadings filed by the other plaintiffs is more limited and focuses on facts specific to their respective dealings with defendants.[4]

### The Parties

Defendant Mamdoh Eltouby owns and operates defendant New York Motor Group and either owns or has an ownership interest in defendant Planet Motor Cars and non-party Hillside Motors. These entities are dealerships that sell used cars and advertise cars for sale on various Internet sites. A: ¶ 34; T: ¶ 16. Nada Eltouby is Mamdoh Eltouby's daughter and was employed at New York Motor Group and Planet Motor Cars at times relevant to plaintiffs' claims. Nada Eltouby assisted with the sale of automobiles and arranging financing for vehicle purchases. A: ¶ 28. Julio Estrada was an employee of the dealerships whose primary responsibilities included arranging financing for customers buying cars from the dealerships. A: ¶ 30. M&T Bank, Capital One Auto Finance, Inc. ("Capital One"), and Santander Consumer USA, Inc. ("Santander") are financial institutions that provided financing to plaintiffs pursuant to Retail Installment Contracts fraudulently prepared by the dealership defendants.

### The Fraudulent Retail Installment Contract Scheme

The following facts are drawn from the PAC filed by plaintiff Alkhatib and generally resemble those alleged by the other plaintiffs. In December 2012, Anwar Alkhatib saw a 2008 Honda Odyssey mini-van advertised on cars.com for a purchase price of $14,995. A: ¶ 34. A

---

[4] Paragraphs from Alkhatib's PAC, Docket Entry 73-1, are referred to herein as A: ¶ __. The PACs filed on behalf of the remaining plaintiffs, other than Tuhin, are similarly referenced: the Freire PAC, Docket Entry 73-2, as F: ¶ __; the Gabrys PAC, Docket Entry 73-3, as G: ¶ __; the Dong PAC, Docket Entry 73-4, as D: ¶ __; and the Chowdhury PAC, Docket Entry 73-5, as C: ¶ __. Tuhin submitted a revised PAC after oral argument together with a letter brief stating that all plaintiffs intend to file similarly revised proposed amended pleadings if permitted to do so. This Tuhin PAC, Docket Entry 70-1 in 13-cv-5643, is referenced as T: ¶ __. When a single complaint is cited, the Tuhin PAC is used because it is the most complete and most recently submitted complaint.

few days later, Alkhatib went to New York Motor Group to inquire about purchasing the vehicle and saw the sale price advertised as $16,995 on the car's window.  A: ¶¶ 35-36.  After some negotiation, Alkhatib agreed to purchase the car for $14,995, with $10,000 down and the remaining $4,995 financed.  A: ¶¶ 37-38.  A salesperson then agreed to lower the price to $13,995 and prepared a purchase invoice listing this amount as the sales price.  A: ¶¶ 39-40.  The salesperson asked Alkhatib to leave a deposit of $200 to keep the deal open and to return the next day to make the financing arrangements.  A: ¶¶ 41-42.  Although he originally refused to do so, the salesperson also provided Alkhatib with a photocopy of a portion of a service invoice that reflected the $200 deposit.  A: ¶¶ 43-44.

When Alkhatib returned the next day, the salesperson told him he had to pay the remainder of the $10,000 down payment before he would be allowed to complete a loan application.  A: ¶ 46.  After giving the salesperson $9,800, Alkhatib waited approximately two hours before he was introduced to a man identified as "John Figueroa," but who, plaintiffs contend, was in fact defendant Julio Estrada.  A: ¶¶ 47-50.  Even though Alkhatib had not yet signed a loan application, Figueroa/Estrada (referred to as "Figueroa" below) informed him that two banks had already declined his credit request.  A: ¶¶ 51-52.  Figueroa refused to provide Alkhatib with the rejection documents and assured him that the banks would send letters to him directly by mail.  A: ¶ 53.  Alkhatib never received any such letters.  A: ¶ 54.  Figueroa then reported that Alkhatib had bad credit, leaving him with two options for financing the vehicle, each of which would result in a drastic increase in the car's cost: one option included a $4,500 processing fee, an annual percentage rate of 15%, and a prepayment penalty, while the other required a $1,750 processing fee, an annual percentage rate of 10%, a $2,700 insurance policy, and a $3,000 service contract.  A: ¶ 55.

At this point, Alkhatib sought to get his deposit back and go elsewhere, but Figueroa told him that the financing process had begun and that Alkhatib could not cancel it or leave without incurring a penalty equal to 35% of the car's cash price. A: ¶ 56-57. Figueroa also asserted that, if Alkhatib canceled the deal, the dealership would retain the $10,000 cash deposit and Alkhatib would be required to hire a collection company to get even a portion of it back. A: ¶ 58. Alkhatib then offered to pay the entire price for the car in cash. A: ¶ 59. Figueroa, though, insisted that was no longer possible and that, if Alkhatib wished to buy the vehicle and avoid the penalty, he would have to select one of the dealership's financing options. A: ¶ 60.

Alkhatib reluctantly selected the second financing option and was told the $7,450 in additional charges were "security conditions" necessary to obtain the loan. A: ¶¶ 62-63. Figueroa prepared a retail installment contract and purchase agreement that stated the vehicle price was $21,457.50 and failed to itemize the additional processing, insurance and service contract charges. A: ¶ 64. The final retail installment contract indicated that the amount financed was $13,309.53 with a $4,034.67 finance charge and an annual percentage rate of 10.76% – amounting to $17,344 in financing and fees and a total cost exceeding $27,000 for a car that had been advertised for $14,995 and for which Alkhatib at one point offered to pay the full amount in cash. A: ¶¶ 66-68. Although Alkhatib had responded to an Internet ad for New York Motor Group and had traveled to a dealership by that name, the $3,000 service contract indicated that the selling dealership was Planet Motor Cars and listed the vehicle's purchase price as $20,000. A: ¶¶ 76-77.

Figueroa represented to Alkhatib that the insurance policy for which Alkhatib was charged $2,700 would mature into a policy with complete automobile insurance coverage after six months. A: ¶ 72. However, the product was not in fact a replacement for car insurance, but a

"Theft Deterrent Product Protection policy."  A: ¶ 70.  Although Figueroa promised Alkhatib

that an insurance card would be mailed to him, Alkhatib never received one.  A: ¶¶ 73-74.

Moreover, when Alkhatib contacted the provider of the Theft Deterrent policy in attempt to

cancel it, he learned he could not do so because the providers of that plan had no record of him

having a policy with them in the first place.  A: ¶¶ 80-81.  Alkhatib contacted both NYMG and

Planet Motors Cars about cancelling the "insurance policy" and the service contract, but neither

responded to his inquiries.  A: ¶¶ 82-86.

New York Motor Group sent the retail installment contract and other information to

Capital One via either fax or the Internet.  A: ¶ 79.  Capital One successfully became an assignee

of Alkhatib's loan and continued to send him billing statements and receive monthly payments,

at least up to the time Alkhatib filed his complaint.  A: ¶ 87.

The other plaintiffs had similar experiences with the dealership defendants.  Some were

exposed to additional tactics, including promises that the financing discussions were being

recorded, G: ¶ 53; T: ¶ 28; pressure to sign the documents quickly, F: ¶ 68; G: ¶ 63; T: ¶ 31; and

false assurances or avoidance during subsequent visits, T: ¶ 48; C: ¶¶ 86, 92; F: ¶¶ 72, 76, 82-83;

G: ¶¶ 123-25.

On June 19, 2013, Shahadat Tuhin went to NYMG to purchase a vehicle he had seen

advertised on the dealership's website for $14,995.  T: ¶ 16.  When he arrived there, Estrada told

Tuhin he would have to sign a sales contract before he could obtain financing, and that the car

would be financed at 5.84% interest for six months and at 2.17% interest for the remaining 54

months of the loan if Tuhin made the first six payments on time.  T: ¶¶ 18, 23.  Estrada falsely

explained that if Tuhin made these payments, he would pay $2,000 down and $9,529.86 in

financing payments for a car advertised at $14,995 on the Internet.  T: ¶ 27.  When Tuhin

questioned a sales contract showing $22,795.87 as the sales price, Estrada showed him a new contract reflecting the lower agreed upon price of $12,000.  T: ¶¶ 29-30.  Estrada rushed Tuhin to sign this document, obscured the areas surrounding the signature block, and refused to immediately provide Tuhin with a copy.  T: ¶¶ 30-31.  When Tuhin returned home, he saw that the document he signed was in fact the original sales contract with the higher sales price.  T: ¶ 35.  Tuhin had also unknowingly signed a retail installment contract for $26,209, which included $4,997.96 in finance charges, a $3,000 service contract, and other unrequested and previously undisclosed "add-ons."  T: ¶ 35.  Moreover, the car itself was not merchantable in that it shook violently when driven.  T: ¶ 53.  Tuhin tried to return the vehicle to NYMG but was met with resistance from Nada Eltouby, Mamdoh Eltouby, and other NYMG employees.  T: ¶¶ 59-65.

In December 2012, plaintiff Simon Gabrys went to NYMG in response to an Internet advertisement for a used car.  G: ¶ 40.  When he arrived, Gabrys agreed to pay $10,000 in a bank check and borrow $9,000 to purchase a vehicle.  G: ¶ 48.  Gabrys met with Estrada, who told Gabrys that he had poor credit and could only obtain a loan from M&T Bank at a rate of 5.7%.  G: ¶ 54.  Estrada represented, however, that the loan could be refinanced at a rate of 2.13% if Gabrys made the first eight loan payments on time.  G: ¶ 55.  Estrada also stated that this deal required purchasing a package of additional products, including a $3,995 service contract, but that Gabrys was entitled to a refund of $3,920 of that charge if Gabrys cancelled the service contract after six months.  G: ¶¶ 57-59.  Gabrys signed a retail installment contract listing a vehicle cash price of $30,895, a down payment of $10,000, and an unpaid balance of $20,895.  G: ¶¶ 63-65.  Gabrys was able to receive only $2,2246.36 after cancelling the service contract,

and the loan was never refinanced at a lower rate as promised despite Gabrys' payments and multiple attempts to have Estrada process his refinancing application.  G: ¶¶ 77, 101-06.

In February 2013, plaintiff Boris Freire sought to buy a vehicle after seeing it advertised on NYMG's website for $14,900. [5]  F: ¶¶ 42-43.  Freire met with a representative of the dealership who identified himself as John Dos Santos, but who plaintiffs contend was in fact defendant Estrada.  F: ¶¶ 15-16, 49.  Dos Santos presented Freire with two financing options after telling Freire that he had a poor credit rating.  F: ¶ 51.  Freire agreed to the second option, which Dos Santos represented would allow Freire to refinance his loan and reduce his monthly payments from $624.72 to $155.27 after four payments.  F: ¶ 51.  Freire, having agreed to the deal, made arrangements to return with a down payment of $7,500.  F: ¶ 53.  When Freire returned the next day with the down payment, he questioned the RIC presented to him because it listed a vehicle cash price of $30,199.96, showed a down payment of $10,500, and required $22,999.96 to be financed.  F: ¶¶ 56, 58.  The contract also stated that Freire was obligated to pay the higher payments over the entirety of the loan period and did not memorialize the promised opportunity to refinance after four payments.  F: ¶ 57.  Additionally, Dos Santos told Freire that the lender required Freire to purchase a package of products including insurance priced at $5,500 and a service contract costing $3,000.  F: ¶¶ 59-60.  Dos Santos made a number of fraudulent assurances to convince Freire to sign the contract.  F: ¶¶ 61-64, 66-67.  Four months later, Dos Santos convinced Freire to pay an additional $3,000 to receive the refinancing he had been promised earlier.  F: ¶¶ 85, 87, 90.  In this interaction, Dos Santos told Freire that if he did not pay the additional $3,000, he would be bound by the terms of the high interest loan for

---

[5] Freire and Miriam Osario, an unmarried couple, are both named as plaintiffs, but there are no facts specifically involving Osario relevant to the pending motions.

another 56 months.  F: ¶ 88.  After paying the $3,000, Freire signed a new RIC providing for a lower monthly payment, but the loan was never refinanced as promised.  F: ¶ 90, 98-99.

In April 2013, plaintiff Zeng Hui Dong went to NYMG and inquired about a car she saw on the lot.  D: ¶ 43.  After Dong put down $7,000 in cash towards the purchase of the car she had selected, Estrada advised her she would have to purchase insurance and service contracts that would add more than $6,000 to the price of the car.  D: ¶ 51.  When Dong said she was not interested and wanted to leave, Estrada threatened that she would lose all but $2,000 of her deposit if she declined to proceed with the purchase and arrange for financing.  D: ¶¶ 54-55.  Although Dong proceeded to sign a RIC, it was never processed, and the lending bank, Capital One, never contacted her.  D: ¶¶ 57, 60-62.  On July 30, 2013, Dong returned to the dealership at Estrada's request.  D: ¶¶ 64-65.  When she arrived, Estrada tried to present her with another RIC, and Dong responded by offering to pay off the balance due for her car in cash.  D: ¶¶ 66-67.  After some negotiations, Estrada accepted her cash and prepared a document crediting Dong for her two lump sum payments, indicating $0 financed, 0% interest charged, and a total down payment matching the car's sale price.  D: ¶¶ 68, 70-73.  Despite this new arrangement, though, in December 2013, Dong received a certificate of title for the purchased vehicle in the mail that listed Santander Consumer USA as a lienholder.  D: ¶¶ 81-82.  Dong later learned that Santander had received a third RIC in her name dated August 2013, bearing a signature distinctly different from her own and indicating an unpaid balance of $18,041.23.  D: ¶¶ 85, 88, 93.  Dong returned to the dealership in February 2014 and showed a copy of the third RIC to Nada Eltouby.  D: ¶ 105.  Nada Eltouby denied knowing about the RIC and advised Dong that the dealership could not do anything to help her because Estrada no longer worked there.  D: ¶ 105.  On March 24,

2014, Santander repossessed Dong's car for not making payments on the third RIC and returned the car to Dong only after this lawsuit was filed. D: ¶¶ 119, 130.

In January 2013, plaintiff Nasrin Chowdhury went to NYMG after seeing an Internet advertisement for a car for sale there. C: ¶ 41. A salesperson rejected her offer to pay for the car in cash, and Chowdhury ultimately agreed to pay $10,000 in cash and to finance $3,500 of the purchase price. C: ¶¶ 43, 44, 47. Estrada offered Chowdhury two financing options with the shorter term, lower interest option requiring a warranty or service contract on the vehicle. C: ¶¶ 61, 63-64. Chowdhury received a sales contract reflecting a sale price of $13,500 and understood that the total price of the vehicle would be $16,556.10 including interest and the service contract. C: ¶¶ 57, 67. However, when Chowdhury received the RIC, it stated a total price of $24,471.00 with $14,911.99 of that amount financed. C: ¶ 77. Estrada assured Chowdhury that a final lump sum payment on the seventh month would pay off the loan in full and that their original agreement was not altered by the RIC. C: ¶ 82. In August 2013, Chowdhury's son gave Estrada the final lump sum payment and Estrada assured him, both verbally and in writing, that the debt on the car had now been fully paid. C: ¶¶ 89-90. However, the lender, M&T Bank, continued to bill Chowdhury and sent her a letter asserting that she was behind in her payments. C: ¶ 96. Chowdhury's son spoke with Nada Eltouby in early October and explained to her that the loan had been paid, and Nada Eltouby assured him that the dealership would take care of everything. C: ¶¶ 101-03. Nada Eltouby spoke with Chowdhury's son again in mid-October and told him that he should speak with the bank because there was nothing she or the dealership could do to assist him. C: ¶¶ 104-05. In early November 2013, Estrada called Chowdhury at her home and threatened to divulge her personal financial information to others and to call her at work in possible retaliation for her persistence. C: ¶ 116.

After police intervention, Estrada had Nada Eltouby prepare a money order from the dealership in the amount of the August 2013 lump sum payment. C: ¶¶ 124-25. Around this time, Chowdhury also discovered that her signature had been forged on the service contract and that the contract contained other falsified information. C: ¶¶ 131, 133-34. Chowdhury was able to recover only 45% of the $2,314 she paid for the service contract despite Estrada's earlier assurance that she would be eligible for a full refund. C: ¶¶ 139-40.

Chowdhury, Tuhin, and Gabrys, the only plaintiffs suing M&T Bank, allege that M&T Bank agreed to fund their loans despite knowing or recklessly disregarding that they had been fraudulently induced to agree to financing agreements. G: ¶ 20. In June 2013, Tuhin called M&T Bank immediately after NYMG electronically sent the assignment documents to M&T Bank, but before the bank had paid any funds to NYMG. T: ¶¶ 44-45. Although Tuhin told an M&T Bank representative he had been defrauded and wanted to cancel his loan, the M&T representative responded that the Bank could not cancel the transaction once the dealership submitted a RIC with his signature. T: ¶ 45. In October 2013, approximately ten months after their loans had been processed and issued, Gabrys and Chowdhury contacted M&T Bank as well. G: ¶ 126; C: ¶ 106. M&T Bank at first made assurances that it would investigate further, but then generally told each plaintiff that there was nothing the bank could do to cancel the loans. T: ¶ 46; G: ¶ 127; C: ¶¶ 107, 112-14. A bank representative suggested to Chowdhury, through her son, that she should retain an attorney, and another bank representative advised Tuhin that he could report any claim of fraud to the New York State Attorney General. C: ¶ 114; T: ¶ 45.

Plaintiffs allege that Nada Eltouby was a key participant who knowingly assisted the dealerships' fraudulent scheme throughout the relevant period. At separate points, plaintiffs observed Nada Eltouby faxing documents to an apparently nonexistent person, G: ¶ 117, and

creating a money order at Estrada's request, C: ¶ 125. Nada Eltouby served as a manager with authority to act on behalf of the dealership. C: ¶ 122; T: ¶¶ 47, 61. For instance, she spoke with police officers responding to a protest held by fraud victims, C: ¶ 122; D: ¶ 107, and received a cash down payment made by one of the plaintiffs and signed a receipt for it, T: ¶ 18. Plaintiffs further allege that Nada Eltouby often spoke on behalf of the dealership to the plaintiffs and, at times, made assurances on NYMG's behalf. C: ¶¶ 102-03; T: ¶ 19; F: ¶ 83.

Mamdoh Eltouby was present for various interactions between the dealerships and the plaintiffs and also authorized numerous actions by his subordinates. Eltouby hired Estrada to serve as a finance manager only weeks after Estrada had been indicted and arrested on multiple counts of theft, larceny, forgery, and fraud related to his actions as the finance manager of another dealership. T: ¶¶ 79, 82. Eltouby hired Estrada despite a public announcement from the Queens County District Attorney that Estrada had defrauded more than 23 consumers out of more than $115,000 with the promise that they could return to him to refinance their high interest loans after six months of timely payments. T: ¶ 80. Plaintiffs allege that Mamdoh Eltouby continues to operate the fraudulent scheme even after Estrada's re-arrest in March 2014 and even without Estrada's continued participation. T: ¶ 85.

## DISCUSSION

### I. Standards Governing Leave to Amend and Judgment on the Pleadings

Leave to amend a pleading "should [be] freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason – such as undue delay, bad faith . . . undue prejudice to the opposing party . . . futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"). Amendments are generally favored because they "tend to facilitate a proper decision

on the merits." *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396 (E.D.N.Y. 1998) (internal quotation marks and citations omitted). The party opposing an amendment to the pleadings has the burden to establish "that leave to amend would be prejudicial or futile." *Id.*; *see also Block v. First Blood Assoc.*, 988 F.2d 344, 350 (2d Cir. 1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."); *Harrison v. NBD Inc.*, 990 F. Supp. 179, 185 (E.D.N.Y. 1998). Thus, "[i]f the movant has at least colorable grounds for relief, justice . . . requires that the court grant leave to amend the complaint." *Sokolski*, 178 F.R.D. at 396 (quoting *Golden Trade, S.r.L. v. Jordache*, 143 F.R.D. 504, 506 (S.D.N.Y. 1992)) (internal quotation marks and brackets omitted).

Whether a proposed amendment to a pleading would be futile is decided pursuant to the same standard that applies to a motion to dismiss. "An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis." *Chan v. Reno*, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996). "In deciding whether an amended complaint meets this threshold, the Court is required to accept the material facts alleged in the amended complaint as true and draw reasonable inferences in the plaintiffs' favor." *Mendez v. U.S. Nonwovens Corp.*, 2 F. Supp. 3d 442, 451 (E.D.N.Y. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)). These principles apply as well when considering a motion to dismiss, whether under Rule 12(b)(6) or 12(c):

> The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a Rule 12(b)(6) motion for failure to state a claim. In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor. The court will not dismiss the case unless it is satisfied that the complaint cannot state any set of facts that would entitle [the plaintiff] to relief.

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2011) (internal citations omitted).

To survive a motion to dismiss, "the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). In other words, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While the court accepts all well-pleaded factual allegations as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Dismissal is appropriate if the well-pleaded allegations in the complaint do not "nudge[] . . . claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Fraud claims are subject to a heightened pleading standard that requires plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). "The complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 119 (2d Cir. 2013) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint alleging fraud must [also] 'allege facts that give rise to a strong inference of fraudulent intent.'" *Space Hunters, Inc. v. United States,* 500 F. App'x 76, 78-79 (2d Cir. 2012) (citation omitted).

Because defendants who oppose leave to amend on futility grounds face the same standard as those who move for judgment on the pleadings under Rule 12, I address defendants' motions to dismiss and their opposition to plaintiffs' motion for leave to amend together.

## II.     Plaintiffs' RICO Claims

RICO provides a civil remedy to persons injured in their business or property by a violation of the statute.  18 U.S.C. § 1964(c).  Plaintiffs assert RICO and RICO conspiracy claims pursuant to 18 U.S.C. §§ 1961(c) and (d) against the various dealership and financial institution defendants.  Alkhatib PAC Count 2; Tuhin PAC Counts 1-2; Freire PAC Counts 3-4; Gabrys PAC Counts 2-3; Dong PAC Counts 1-2; Chowdhury PAC Counts 1-2.

A plaintiff asserting a civil RICO claim must allege "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)).  A defendant may be held liable for violating RICO if the defendant, through the commission of two or more acts constituting a pattern of racketeering activity, directly or indirectly participated in the affairs of an enterprise involved in interstate commerce.  *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 6 (2010); *Allstate Ins. Co. v. Valley Phys. Med. & Rehab., P.C.*, 2009 WL 3245388, at *3 (E.D.N.Y. Sept. 30, 2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  Defendants challenge the sufficiency of plaintiffs' RICO allegations on a number of grounds, each of which is addressed below.[6]

---

[6] To establish a RICO conspiracy pursuant to Section 1962(d), a plaintiff must prove that a defendant entered into an agreement to form a RICO enterprise and violate RICO's substantive provisions.  *See United States v. Applins,* 637 F.3d. 59, 74 (2d Cir. 2011).  Defendants do not raise any arguments directed specifically to plaintiffs' RICO conspiracy claims, and I therefore do not separately address those claims here.

A. RICO Enterprise

In their proposed amended complaints, each plaintiff brings a RICO claim against Mamdoh Eltouby, Nada Eltouby and Julio Estrada that alleges an association-in-fact enterprise "comprised of the auto dealerships owned, operated, overseen or otherwise controlled by Mr. Eltouby, or in which Mr. Eltouby is an officer. They include New York Motor Group, Planet Motor Cars, and Hillside Motors, LLC." T: ¶ 127.[7] This alleged enterprise is referred to below as the "Dealership Enterprise." In addition, plaintiffs Chowdhury, Gabrys, and Tuhin each assert a RICO claim against New York Motor Group and M&T Bank that alleges an association-in-fact enterprise comprised of these two named defendants. T: ¶ 96; G: ¶¶ 146-47 (including Planet Motor Cars in addition to NYMG and M&T Bank), C: ¶¶ 148-49 (including Planet Motor Cars in addition to NYMG and M&T Bank). This second alleged enterprise is referred to below as the "M&T Enterprise."

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association-in-fact" enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 956 (2009); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) (describing an enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct"); *Hemmerdinger Corp. v. Ruocco*, 976 F. Supp. 2d 401, 413 (E.D.N.Y. 2013) (same). Courts in this district have recognized that "*Boyle* establishes a low threshold for pleading such an enterprise." *Delgado v. Ocwen Loan Servicing, LLC*, 2014

_____

[7] Although the wording they use is slightly different, the other complaints include similar enterprise allegations. A: ¶ 105, F: ¶ 173, G: ¶ 178, D: ¶ 169, C: ¶ 180.

WL 4773991, at *16 (E.D.N.Y. Sept. 24, 2014) (quoting *McGee* v. *State Farm Mut. Auto. Ins. Co.*, 2009 WL 21232439, at *4 n.7 (E.D.N.Y. July 10, 2009)).  Formal hierarchy, role differentiation, regular meetings, or established procedures are not required; rather, an informal group may constitute an enterprise as long as "the group . . . function[s] as a continuing unit and remain[s] in existence long enough to pursue a course of conduct."  *Boyle*, 556 U.S. at 948.

A RICO enterprise must have an ascertainable structure distinct from the pattern of racketeering activity in which its members engage.  *Turkette*, 452 U.S. at 583 (holding that "[t]he 'enterprise' is not the 'pattern of racketeering activity;' it is an entity separate and apart from the pattern of activity in which it engages").  Nevertheless, "the evidence used to prove the pattern of racketeering activity, and the evidence establishing an enterprise 'may in particular cases coalesce.'"  *Boyle*, 556 U.S. at 947 (quoting *Turkette*, 452 U.S. at 583); *see also United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 473 (E.D.N.Y. 2007).  Finally, the enterprise as alleged must be distinct from the person or persons alleged to be conducting the affairs of the enterprise.  *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 343-45 (2d Cir. 1994).  This requirement is satisfied when an owner or employee of a corporation is the person alleged to be conducting the affairs of the enterprise and the enterprise is the corporation itself.  *Kushner*, 533 U.S. at 163-64; *see also, Palatkevich v. Choupak,* 2014 WL 1509236, at *14-15 (S.D.N.Y. Jan. 24, 2014) (concluding, after close analysis of relevant precedent, that, "[a]fter *Kushner* and *Riverwoods/Cruz*, the distinctness rules are as follows: within the meaning of § 1962(c), a *natural person* named as the defendant 'person' is inherently distinct from a corporate entity 'enterprise' for which he acts as an agent; in such a case, the distinctness requirement is met").

Defendants contend that plaintiffs' enterprise allegations are insufficient. The dealership defendants argue that the plaintiffs fail to allege that the Dealership Enterprise has any hierarchical structure or an existence separate and apart from its alleged racketeering activity. NYMG Memorandum of Law in Support of Cross-Motion ("NYMG Mem."), Docket Entry 79, at 12-13. This argument lacks merit for several reasons. First, "an established hierarchy is not essential to the existence of an enterprise." *U.S. v. Burden*, 600 F.3d 204, 215 (2d Cir. 2010) (citing *Boyle*, 556 U.S. at 948). Even if it were, plaintiffs' allegations would be sufficient; plaintiffs allege that NYMG is a limited liability company owned and operated by defendant Mamdoh Eltouby that employed defendants Nada Eltouby and Julio Estrada. T: ¶¶ 9, 11-13. Plaintiffs' factual allegations describe actions taken by each of the individual defendants on behalf of NYMG from which their roles in the enterprise may be logically inferred. T: ¶¶ 23-34, 47-48, 56, 63, 65. Second, the facts alleged by plaintiffs indicate that NYMG and the other dealerships owned and operated by Mamdoh Eltouby were ongoing businesses that, among other things, advertised on the Internet, maintained lots where used cars could be viewed, and employed personnel with whom purchases of cars could be arranged. To the extent plaintiffs' complaints suggest that the dealerships owned by Eltouby engaged in fraud as a matter of course, the alleged facts establishing the enterprise and the pattern of racketeering may "coalesce," but that is no obstacle to concluding that the enterprise allegations are sufficient. *Boyle*, 556 U.S. at 947. Finally, as noted above, a complaint satisfies RICO's distinctness requirement if it alleges an enterprise comprised of a corporation or related corporations and names as defendants natural persons who own or work for the corporations and participated in the corporation's affairs through a pattern of racketeering.[8] That is certainly the case here. Accordingly, defendants'

---

[8] The Alkhatib PAC appears to name the dealership entities as defendants alongside the natural persons in violation of *Kushner*. I do not dwell on this deficiency because, if leave to amend is granted, the Alkhatib Amended

challenge to the sufficiency of the allegations describing the Dealership Enterprise should be rejected.

Defendant M&T Bank similarly challenges the sufficiency of plaintiffs' enterprise allegations. M&T Bank Memorandum of Law in Support of Cross-Motion ("M&T Bank Mem."), Docket Entry 62 in 13-cv-5643, at 7-8. Here too, however, the allegations are sufficient. NYMG and M&T Bank are distinct legal entities, separate and apart from each other and hence from the alleged enterprise consisting of them both. Plaintiffs Chowdhury, Gabrys, and Tuhin allege that these entities developed an ongoing relationship whereby NYMG would arrange financing for its customers through M&T Bank. Even if most or even all of the financing NYMG provided to its customers involved fraud, the result would be only "coalescing" of the facts establishing the existence of the enterprise and those proving the pattern of racketeering, and would not undermine the sufficiency of plaintiffs' allegations concerning the M&T Enterprise. Nor is it necessarily fatal to plaintiffs' M&T Enterprise allegations that, as discussed below, I conclude that plaintiffs' allegations against M&T Bank as a RICO defendant are insufficient. Courts have often found an association-in-fact enterprise to be properly pled even if some members of the alleged enterprise are not named as defendants in the case. *See, e.g., City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 448, 451 (2d Cir. 2008), *rev'd on other grounds*, *Hemi Grp., LLC v. City of New York* 559 U.S. 1 (2010); *Mark v. J.I. Racing, Inc.*, 1997 WL 403179, at *5 (E.D.N.Y. July 9, 1997); *see also Three Rivers Provider Network, Inc. v. Meritain Health, Inc.*, 2008 WL 2872664, at *14-15 (S.D. Cal. July 23, 2008); *Titan Int'l, Inc. v. Becker*, 189 F. Supp. 2d 817, 820, 824 (C.D. Ill. 2001); *Metrahealth Ins. Co. v. Anclote Psychiatric Hosp., Ltd.*, 1997 WL 728084, at *4 (M.D. Fla. Oct. 23, 1997) (motion to dismiss

---

Complaint will be revised to conform to the most recent Tuhin PAC. This PAC, attached to the plaintiffs' letter submitted after oral argument, names the defendants in a manner consistent with *Kushner*.

denied as to question of enterprise, but granted to the extent of requiring a more detailed RICO statement; *Benard v. Hoff*, 727 F. Supp. 211, 214-15 (D. Md. 1989). Accordingly, defendants' challenge to the sufficiency of plaintiffs' allegations with respect to the M&T Enterprise should be rejected as well.

B. <u>Conducting the Enterprise's Affairs Through Racketeering Activity</u>

RICO liability does not extend to all "persons" associated with an enterprise, but is limited to those who "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Defendants challenge the sufficiency of plaintiffs' allegations of racketeering activity. At least two defendants – Nada Eltouby and M&T Bank – argue as well that plaintiffs' allegations about their participation in the conduct of an enterprise's affairs through racketeering activity are insufficient to support RICO claims against them. Finally, defendants argue that, even if racketeering activity were otherwise properly alleged, plaintiffs' RICO claims would be subject to dismissal because plaintiffs fail to allege a pattern of racketeering that satisfies RICO's continuity requirement.

"Racketeering activity" is defined in the RICO statute as any of various state or federal crimes, including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343. *See* 18 U.S.C. § 1961(1)(B). A "pattern of racketeering activity" requires at least two predicate acts of racketeering activity committed within a ten-year period. 18 U.S.C. § 1961(5); *First Capital Asset Mgmt., Inc. v. Satinwood,* 385 F.3d 159, 178 (2d Cir. 2004). "To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are 'related, and they amount to or pose a threat of continued criminal activity.'" *Cofacrèdit,*

*S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

## 1. Mail and Wire Fraud - Specificity

Mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, respectively, require proof of three elements: (1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of the mails or interstate transmission facilities in furtherance of the scheme. *S.Q.K.F.C., Inc. v. Bell Atl. TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996) (quoting *United States v. Gelb*, 700 F.2d 875, 879 (2d Cir. 1983)). A scheme to defraud "has been described as a plan to deprive a person 'of something of value by trick, deceit, chicane, or overreaching.'" *United States v. Autori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations omitted).

As noted above, claims of fraud are subject to a heightened pleading standard. Allegations of predicate mail and wire fraud violations must state the "contents of the communications, who was involved, [] where and when they took place, and [] explain why they were fraudulent." *Spool*, 520 F.3d at 185 (internal quotation marks and citation omitted). In addition, while a defendant's "intent to defraud may be averred generally under Rule 9(b), such allegations of scienter must be supported by facts 'giving rise to a strong inference that the defendant knew the statements to be false and intended to defraud the plaintiff' at the time they were made." *U.S. Fire Ins. Co. v. United Limousine Service, Inc.*, 303 F. Supp. 2d 432, 443-44 (S.D.N.Y. 2004) (quoting *Ouaknine v. MacFarlane*, 897 F.2d 75, 79-80 (2d Cir. 1990)); *see also First Capital Asset Mgmt.*, 385 F.3d at 179.

Defendants argue that plaintiffs' complaints fail to plead the predicate acts with sufficient specificity and instead rely on mere "bare-boned conclusory allegations." NYMG Mem. at 6;

*see also* M&T Bank Mem. at 15.  As the facts recounted above demonstrate, though, plaintiffs'

Proposed Amended Complaints are anything but bare-boned.  Plaintiffs describe in exhaustive

detail a sophisticated scheme pursuant to which the dealership defendants lure customers in with

low advertised prices, use aggressive sales tactics and false promises to induce customers to

enter into onerous financing agreements, and fraudulently conceal from customers that the

documents presented to them contain undisclosed charges.  Plaintiffs identify the particular

individuals who made statements to them, what statements they made, and why the statements

were part of a fraudulent scheme.

Alkhatib, for example, alleges that he arrived at NYMG interested in a car that was

advertised for $14,995, only to be essentially coerced and defrauded into signing a retail

installment contract with a total cost exceeding $27,000.  Alkhatib's complaint describes how a

NYMG salesperson required that he turn over a $10,000 down payment that Estrada would later

refuse to return when Alkhatib – unwilling to enter into the financing arrangements proposed by

Estrada – asked for his deposit back.  Alkhatib also alleges that Estrada falsely informed him that

two banks denied his loan application before he had even made one, and refused to provide any

documents evidencing the banks' rejection, promising the bank would send the documents –

which never arrived – directly to Alkhatib.  Finally, Alkhatib alleges that he was promised, and

paid for, insurance he never received, and was charged for processing, insurance and service fees

that were never itemized.

Tuhin's complaint is similarly specific.  Among other allegations, Tuhin asserts that

Estrada persuaded him to enter into a high-interest loan by falsely representing to him that the

interest rate would drop markedly after six months if Tuhin made his first six payments on time.

Tuhin also alleges that, when he questioned a sales contract showing a $22,795.87 sales price,

Estrada showed him a new contract reflecting a lower agreed-upon price of $12,000, but then switched the documents, so that Tuhin ended up signing the first sales contract with the higher sales price. Gabrys and Freire allege, among other things, similar false representations about a reduction in the interest rates on their loans after a few months of timely payments. Dong alleges that she paid Estrada a lump sum equal to the amount owed on her car loan, but that her signature was forged on a retail installment contract and that she was provided a certificate of title encumbered by a lien in favor of a lender to whom she owed nothing. Like the other plaintiffs, Chowdhury found that she had signed a RIC with terms substantially different from those described to her by Estrada, and continued to receive billing notices from her lender even after paying off her loan in full by delivering cash directly to Estrada.

These are only some of the highly specific allegations of fraud set forth in plaintiffs' complaints. Defendants' contention that plaintiffs have failed to plead fraud with sufficient specificity should therefore be rejected.

2. Mail and Wire Fraud – Use of the Mails and Interstate Wires

Defendants also challenge the adequacy of plaintiffs' allegations that the mails or interstate wire communications were used in furtherance of the alleged fraudulent scheme. As defendants point out, while plaintiffs identify a large number of wire transmissions in their complaints, they do not allege that these transmissions crossed state lines. T: ¶¶ 104(b)-(g). Rather, the alleged wire transfers were between NYMG and M&T Bank, both of which are located in New York. T: ¶¶ 9-10. These allegations are therefore not sufficient to plead interstate use of the wires. *See Bernstein v. Misk*, 948 F. Supp. 228, 239 (E.D.N.Y. 1997) ("[W]here all parties are New York residents, 'all telephone calls are presumed to be intrastate

and, absent any indications otherwise, the predicate act of wire fraud is not stated.'" (citation omitted)).

Plaintiffs, however, also allege that NYMG used the Internet to advertise and that several of the plaintiffs came to the dealership in response to Internet ads. T: ¶ 104(a). The use of advertising on the Internet in furtherance of an alleged fraud satisfies the interstate wire requirement of § 1343. *See DNJ Logistic Group, Inc. v. DHL Express (USA), Inc.*, 2010 WL 625364, at *6 n.4 (E.D.N.Y. Feb 19, 2010) (finding plaintiff adequately pleaded wire fraud even though plaintiff and defendant were located in New York because "recent cases appear to treat any use of the internet as sufficiently interstate in nature"). Because each plaintiff except Dong responded to an Internet advertisement posted by the dealership defendants, plaintiffs allege a pattern of use of the interstate wires in furtherance of the fraud occurring on multiple occasions within a period of ten years.

Plaintiffs either allege, or indicate they will allege, having received billing statements in the mail from the lender on their respective RICs. T: ¶ 104(h), (i), (k). While the dealership defendants may not have mailed these billing statements, it is well-settled that a defendant may be liable for mail fraud even if he or she did not personally use the mails; rather, a plaintiff need only show that "defendants could reasonably have foreseen that [a] third-party would use the mail in the ordinary course of business as a result of defendants' act." *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir. 1989); s*ee also Pereira v. United States*, 347 U.S. 1, 8-9 (1954) (holding that, "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used" (citation omitted)). Certainly, repeated mailings of multiple billing statements by lenders to plaintiff borrowers were

a reasonably foreseeable consequence of a scheme to defraud plaintiffs into entering into onerous retail installment contracts. The mailing to Dong of a certificate of title reflecting a lien despite the fact that Dong did not finance her purchase was reasonably foreseeable as well. Plaintiffs' allegations therefore satisfy the element of use of the mails.

### 3. Mail and Wire Fraud – Intent/Participation through a Pattern of Racketeering

To be held liable under RICO, a defendant must be shown to have participated in the conduct of the charged enterprise's affairs through a pattern of racketeering activity. 18 U.S.C. § 1962(c). In the context of this case, then, plaintiffs must allege facts that, if true, establish that each defendant participated in the conduct of the affairs of the relevant enterprise, and that each did so at least in part by committing mail or wire fraud.

As noted above, to establish that a defendant committed mail or wire fraud, a complaint must allege "facts giving rise to a strong inference that the defendant knew the statements to be false and intended to defraud the plaintiff at the time they were made." *U.S. Fire Ins. Co.*, 303 F. Supp. 2d at 444 (internal quotation marks and citation omitted). A plaintiff contending that a defendant participated in conducting the affairs of an enterprise must allege that the defendant "participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). While a person who participates in the conduct of an enterprise "must have some part in directing [the enterprise's] affairs . . . RICO liability is not limited to those with primary responsibility" for those affairs, but may extend to "lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 179, 184; *see also DeFalco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001); *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (holding that a RICO defendant need "not act[] in a managerial role," but may be held "liable for directing the enterprise's affairs if he exercised broad discretion in carrying out the

instructions of his principal"). Nonetheless, "the simple taking of directions and performance of tasks that are necessary or helpful to the enterprise, without more, is insufficient to bring a defendant within the scope of § 1962(c)." *Diaz*, 176 F.3d at 92 (citing *United States v. Viola*, 35 F.3d 37. 41 (2d Cir. 1994)); *see also, United States v. Allen*, 155 F.3d 35, 42 (2d Cir. 1998) ("In most of the cases in which we have held lower level employees to be RICO participants, the defendant was shown to have played some management role in the enterprise.") (collecting cases).

### a. Mamdoh Eltouby and Nada Eltouby

Mamdoh Eltouby and Nada Eltouby are alleged to have participated in the conduct of the affairs of the Dealership Enterprise. T: ¶ 128. The facts alleged in the complaints with respect to Mamdoh Eltouby and Nada Eltouby are sufficient to establish their participation in the conduct of the charged enterprise and to give rise to a strong inference of intent to defraud.

Mamdoh Eltouby is alleged to have owned and operated NYMG at the time of the transactions involving the plaintiffs. T: ¶ 11. This alone indicates that he participated in the operation and management of the enterprise, and – particularly in light of the pervasiveness of the fraudulent scheme suggested by the number of plaintiffs who had similar experiences – gives rise as well to a strong inference that he knew of and abetted the scheme. In addition, plaintiff Tuhin alleges that, when he came to the dealership to participate in an organized protest, Mamdoh Eltouby identified himself as the owner of NYMG and attempted to assault the protestors by hitting them with his car. T: ¶ 56. Mamdoh Eltouby also refused to make arrangements for safekeeping of the car NYMG sold to Tuhin, even after Tuhin retained counsel and alerted NYMG to his complaints. T: ¶ 65. Plaintiffs have also identified a NYMG customer who has not filed suit but who met directly with Mamdoh Eltouby and was directed by Eltouby

to meet first with Estrada and later with an employee at Hillside Motors. This customer, like plaintiffs, was urged to enter into a sub-prime loan and was falsely promised he could refinance the loan within six months. T: ¶¶ 138(a), (j). Finally, plaintiffs allege that Mamdoh Eltouby hired Estrada to work at NYMG even after Estrada had been indicted and arrested for defrauding customers while working at other used car dealerships, and that Estrada continued to work for NYMG even after the District Attorney for Queens County issued a press release announcing Estrada's indictment. T: ¶¶ 79-83. These allegations are more than ample to demonstrate Mamdoh Eltouby's participation in the conduct of the enterprise's affairs and to give rise to a strong inference of knowledge of the scheme and intent to defraud.

The allegations concerning Nada Eltouby are likewise sufficient. Plaintiff Tuhin alleges that Nada Eltouby, after assuring Tuhin he was getting a good deal, took $2,000 from him and provided him with a receipt. T: ¶¶ 18-19. On each of several occasions when Tuhin returned to the dealership to complete his transaction, he observed Nada Eltouby there, interacting with other employees in what appeared to be a supervisory role. T: ¶ 34. On another occasion when Tuhin arrived at the dealership in an attempt to cancel the transaction, the employee he approached called over Nada Eltouby and Julio Estrada. Nada Eltouby urged Tuhin to trust Estrada and repeated the false representation, previously made by Estrada, that Tuhin's interest rate would be reduced after six timely payments. T: ¶¶ 47-48. Subsequently, after Tuhin left the car he had purchased and the keys to it with NYMG, Nada Eltouby advised Tuhin's attorney that NYMG had driven the car back to Tuhin's neighborhood and parked it in the street near Tuhin's home without license plates. T: ¶ 61. Plaintiff Chowdhury similarly alleges that, when her son went to the dealership to complain, it was Nada Eltouby who met with him, and who at first assured him the dealership "would take care of everything," but later told him there was nothing

the dealership could do and that he should "speak to 'the bank.'"  C: ¶¶ 102-05.  Plaintiff Dong alleges that, upon returning to the dealership to complain about her transaction, she too met with Nada Eltouby.  Nada Eltouby told Dong that there was nothing the dealership could do to help her.  Dong then called for police assistance.  When police officers arrived, Nada Eltouby met with them and spoke to them on NYMG's behalf.  D: ¶¶ 104-07.  Finally, plaintiffs Freire and Gabrys also allege that Nada Eltouby was among the NYMG employees who met with them when they returned to NYMG after completing their transactions to complain that the representations made to them turned out not to be true.  F: ¶¶ 83, 86; G: ¶¶ 116, 123.

Plaintiffs' allegations give rise to a strong inference that Nada Eltouby's role involved more than simply taking directions and performing tasks helpful to the enterprise, and that she was aware of the overall fraudulent scheme.  By alleging that she spoke with disgruntled customers and gave them false assurances, met with police officers and presented NYMG's position with respect to customer complaints to them, and even communicated with plaintiffs' counsel about bringing a returned vehicle back to a customer's neighborhood and leaving it there without license plates, plaintiffs allege that Nada Eltouby played a significant part in directing the affairs of the enterprise and advancing the goals of the scheme to defraud.  Even if Nada Eltouby's role were less clear, dismissal of plaintiff's RICO claim against her would not be warranted at this stage of the case:

> It is not always reasonable . . . to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether a defendant was merely "substantially involved" in the RICO enterprise or participated in the "operation or management" of the enterprise.  Thus, where the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be entitled to take discovery on this question.

*Aiu Ins. Co. v. Olmecs Med. Supply, Inc.*, 2005 WL 3710370, at *8 (E.D.N.Y. Feb. 22, 2005)

(citing *Friedman v. Hartmann,* 1994 WL 376058, at *2 (S.D.N.Y. July 15, 1994)).

*b.  M&T Bank*

Plaintiffs name M&T Bank and NYMG as defendants in a RICO count that charges an association-in-fact enterprise comprised of the two defendants and a pattern of racketeering activity consisting of mail and wire fraud.  The allegations with respect to New York Motor Group's participation in the fraud are plainly sufficient, as demonstrated by the discussion above of the facts asserted with respect to its owner and operator, Mamdoh Eltouby, and its employees, Julio Estrada and Nada Eltouby.  The facts alleged with respect to M&T Bank, however, fall short.

Plaintiffs' allegations with respect to M&T Bank's scienter are limited.  Plaintiffs suggest that M&T Bank continued to process and fund loans even after it knew or should have known of NYMG's fraudulent scheme.  Plaintiffs contend that M&T Bank should have known of the scheme because several customers had made complaints about NYMG and because of how the "value of the collateral . . . compared to the sale price and the amount of add-on charges."  T: ¶ 46.  Plaintiffs' specific allegations, however, simply do not give rise to a strong inference that M&T Bank knew of any false statements or intended to participate in defrauding any of the plaintiffs.

Plaintiffs place particular emphasis on M&T Bank's decision to fund the Tuhin loan even after Tuhin called the bank and complained he had been defrauded.  Plaintiffs allege that M&T Bank should have known when Tuhin called that NYMG was engaged in a fraudulent scheme because of complaints from other customers.  T: ¶ 46.  The only other customers plaintiffs specifically identify as having raised complaints with M&T Bank, however, are Gabrys and

30

Chowdhury. Tuhin made his call to M&T Bank on June 24, 2013. T: ¶ 45. Gabrys and Chowdhury made their complaints to M&T Bank in October of 2013. G: ¶ 126, C: ¶ 106. Thus, the complaints made by Gabrys and Chowdhury could not possibly have informed M&T Bank's response to Tuhin.

Moreover, plaintiffs do not adequately allege that any representative of M&T Bank made any false representation to any plaintiff. Tuhin alleges that an M&T Bank representative told him that the bank could not refuse to fund his loan once the dealership submitted an application with his signature. T: ¶ 45. Plaintiffs do not contend that this statement was false; indeed, although the complaint is not entirely clear in this regard, it appears that Tuhin left the dealership with the car he purchased on June 22, 2013, and had thus been in possession of the vehicle for two days when he asked M&T Bank not to fund his loan. T: ¶¶ 25-26. These circumstances suggest that the bank's hands might well have been tied. Moreover, when Tuhin complained to M&T Bank about having been defrauded, the M&T Bank representative suggested that Tuhin contact the office of the New York State Attorney General. T: ¶ 45. A representative of M&T Bank who spoke to Chowdhury's son similarly suggested that Chowdhury hire an attorney to pursue her claims against NYMG. C: ¶ 114. Suggestions like these hardly give rise to a strong inference of fraudulent intent.

Plaintiffs are also unable to point to anything about the Tuhin, Gabrys or Chowdhury retail installment contracts that would have alerted someone reviewing them that they were fraudulent. Although plaintiffs allege that the value of the cars sold was not consistent with the sales prices charged, they do not allege that personnel at M&T Bank were familiar with used car values or were called upon to verify them before approving loan documents. Moreover, to the extent the value of collateral would be of interest to a lender, the lender's concern would no

doubt be with the value of the collateral relative to the amount financed rather than the purchase price. There is similarly no reason to infer that the "add-on charges" also pointed to by plaintiffs would have alerted anyone at M&T Bank that the loan transactions were fraudulent.

Finally, the fact that the six transactions giving rise to these related lawsuits were financed by three different lending institutions further undermines any inference that mere participation as a lender in transactions conducted by NYMG is enough to suggest fraudulent intent. Had there been a corrupt understanding or relationship between NYMG and M&T Bank, it is unlikely that the dealership defendants would have steered purchasers to other banks to obtain financing.

Plaintiffs invoke the well-settled principle that "deliberate disregard" for the truth may satisfy the scienter requirement for fraud. *See United States v. Precision Medical Laboratories*, *Inc.*, 593 F.2d 434, 443-44 (2d Cir. 1978); *United States v. Sarantos*, 455 F.2d 877, 880-81 (2d Cir. 1972). The facts alleged in plaintiffs' complaint, though, fail to demonstrate that M&T Bank deliberately disregarded earmarks of fraud or had any authority or responsibility to intervene on plaintiffs' behalf.

Plaintiffs' RICO claims against M&T Bank fail for a second, related reason: the role in the fraud attributed to M&T Bank in plaintiffs' complaints does not rise to the level of participating in the conduct of the affairs of an enterprise.[9] In *Reves v. Ernst & Young*, 507 U.S. 170 (1993), defendants were accountants who drafted misleading financial statements and were subsequently sued under both the securities laws and RICO. The district court granted summary

---

[9] Plaintiffs' complaints define the relevant enterprise as comprised of M&T Bank and NYMG. M&T Bank of course participated in the conduct of the affairs of M&T Bank, and therefore may be said to have participated in the conduct of the affairs of the associated entities M&T Bank and NYMG. But Section 1962(c) requires that a defendant participate in the conduct of the affairs of an enterprise *through a pattern of racketeering activity*, and M&T Bank's alleged role in the racketeering activity is too indirect to amount to participation in the conduct of the affairs of the M&T enterprise.

judgment to defendants on RICO on the grounds that the accountants' conduct did not amount to participation in the operation or management of the claimed enterprise. The remaining securities fraud claims proceeded to trial, and the jury found for plaintiffs. Despite the jury's finding that defendants had committed intentional fraud, the Supreme Court upheld the grant of summary judgment in favor of the accountants on plaintiffs' RICO claim, holding that the mere drafting of statements based on misinformation supplied by the defendants' clients did not rise to the level of *directing the enterprise's affairs* and therefore did not constitute sufficient participation in the operation or management of the enterprise for RICO liability.

*Reves* involved a motion for summary judgment, and courts differ on the degree to which *Reves* applies to a motion to dismiss. *Compare City of New York v. FedEx Ground Package System, Inc.*, 2015 WL 1013386, at *8 (S.D.N.Y. Mar. 9, 2015) (noting that, "[i]n this Circuit, the operation or management test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage." (citations omitted)) *with Zhu v. First Atlantic Bank*, 2005 WL 2757536, at *5 (S.D.N.Y. Oct. 25, 2005) (stating, in the course of deciding a motion to dismiss, that "[t]he 'operation and management' [sic] test set forth by the Supreme Court in *Reves* is a very difficult test to satisfy," and holding that providing banking services is insufficient to state a claim under Section 1962(c)) (citation omitted)).

Regardless of the test applied, plaintiffs' allegations are insufficient. Pleadings asserting RICO claims against outside service professionals like banks, law firms, and accounting firms have been held sufficient after *Reves* only when they have alleged more substantial involvement by the outsider defendant in the charged racketeering activity than plaintiffs attribute to M&T Bank here. For example, in *Ifill v. West*, 1999 WL 690144, at *8 (E.D.N.Y. Aug. 24, 1999), the Court held that defendant bank employees provided services that were more than merely

incidental to the fraudulent scheme when they recruited prospective victims by distributing brochures and conducting seminars the victims attended. Similarly, in *Burke v. Dowling*, 944 F. Supp. 1036, 1055 (E.D.N.Y. 1995), the Court declined to dismiss a RICO claim against a bank because of allegations that the bank helped initiate the alleged fraudulent syndication scheme and took advantage of the fact that other defendants owed money to the bank to exercise control over them.[10] *See also Dep't of Econ. Dev. v. Arthur Anderson & Co. (U.S.A.)*, 924 F. Supp. 449, 466 (S.D.N.Y. 1996) (noting that "[m]any other courts faced with post-*Reves* § 1962(c) claims against outside professionals have agreed that providing important services to a racketeering enterprise is not the same as directing the affairs of the enterprise").

Here, plaintiffs allege that M&T Bank's participation in the racketeering affairs of the enterprise consisted only of summarily granting the loan applications created by the dealership defendants, failing to investigate the plaintiffs' claims of fraud, and collecting the payments due under the allegedly fraudulent loans. Although plaintiffs allege the funding was an integral part of the enterprise, these acts fall short of satisfying the "operation and management" test. *See Burke*, 944 F. Supp. at 1055 (noting that even a bank that knowingly received diverted funds or assisted in preparing a private placement memorandum did not operate or manage the enterprise). Rather, the allegations against M&T Bank made by plaintiffs are analogous to those described as inadequate in *Arthur Anderson*:

> An accountant's audit reports, or a lawyer's opinion letters, are always "integral to the continuing operation" of the enterprise in the sense that professional services are essential to the continued existence of a business. But so is the electricity supplied to the enterprises' offices, and it would be absurd to say that the public utility that provides the electricity participates in the operation or management of the enterprise. . . . [T]he rule, uniformly applied by the lower courts that have reached the issue, [is] that the provision of services – even

---

[10] These cases may be further distinguished by their reliance on the pleading standard that prevailed before *Iqbal* and *Twombly* were decided.

essential services – to a RICO enterprise is not the same as controlling the enterprise's affairs.

924 F. Supp. at 467-68 (citations omitted).

For all these reasons, I conclude that the allegations against M&T Bank are insufficient to give rise to a strong inference of knowing and intentional participation in a fraudulent scheme or to establish M&T Bank's participation in the conduct of the affairs of an enterprise through a pattern of racketeering. I therefore recommend that the § 1962(c) claims against M&T Bank be dismissed.

### C.  Relatedness and Continuity of Pattern

To constitute a pattern of racketeering activity, predicate acts must be "related" and "amount to or pose a threat of continued activity." *Cofacrèdit*, 187 F.3d at 242 (emphasis omitted); *see also United States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006). The continuity requirement may be satisfied by showing either close-ended continuity or open-ended continuity. *Cofacrèdit*, 187 F.3d at 242. Defendants challenge the relatedness of the predicate acts, M&T Bank Mem. at 10, and argue that plaintiffs have failed to establish continuity, NYMG Mem. at 9-12, M&T Bank Mem. at 12-15.

#### 1.  Relatedness

A plaintiff must demonstrate that predicate acts are related both horizontally and vertically. *Daidone*, 471 F.3d at 375. Horizontal relatedness describes the relationship between the predicate acts themselves, while vertical relatedness describes the relationship between the predicate acts and the overall RICO enterprise. *Id.* In practice, these tests may be satisfied with a single showing that each individual predicate act is related to the RICO enterprise. *Id.* Here, the alleged predicate acts of mail fraud and wire fraud concern the sale of used cars and the financing arrangements made in connection with those sales. The enterprises are comprised of

the used car dealerships that made the sales and the banks that provided the financing. The predicate acts are thus each related to the RICO enterprises described in the complaints, and plaintiffs therefore satisfy RICO's relatedness requirement.

### 2. Close-Ended Continuity

To demonstrate "close-ended continuity, the plaintiff must prove 'a series of related predicates extending over a substantial period of time.'" *Cofacrèdit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242). "Although close-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether close-ended continuity exists." *Cofacrèdit*, 187 F.3d at 242 (quoting *GICC Capital Corp. v. Tech. Fin. Group. Inc.*, 67 F.3d 463, 467-68 (2d Cir. 1995)). Since the Supreme Court's decision in *H.J. Inc.*, the Second Circuit "has never held a period of less than two years to constitute a substantial period of time." *Cofacrèdit*, 187 F.3d at 242; *Spool*, 520 F.3d at 184 (finding a sixteen-month period to be insufficient to establish close-ended continuity); *DeFalco*, 244 F.3d at 321-22. The relevant period when evaluating continuity "is the time during which RICO predicate activity occurred, not the time during which the underlying scheme operated or the underlying dispute took place." *Spool*, 520 at 184 (citations omitted).

Plaintiffs allege that the association-in-fact enterprise was operating since at least 2012, Gabrys ¶ 40. However, time for purposes of close-ended continuity is calculated based upon when defendants committed predicate acts. *See Cofacrèdit*, 187 F.3d at 243; *Delgado v. Ocwen Loan Servicing*, 2014 WL 4773991, at *21 (E.D.N.Y. Sept. 24, 2014). Accordingly, the relevant time period here must begin in December of 2012, the date of the earliest alleged Internet advertisement. A: ¶ 34. Because the most recent of these related cases was filed in May 2014,

only seventeen months after that advertisement, plaintiffs have failed to allege a pattern of racketeering activity occurring over a period of more than two years, and the allegations of their complaints thus fail to demonstrate close-ended continuity.

### 3. Open-Ended Continuity

Plaintiffs do, however, plead facts supporting a finding of open-ended continuity. Open-ended continuity requires "a threat of continuing criminal activity beyond the period during which the predicate acts were performed." *Cofacrèdit*, 187 F.3d at 242 (citation omitted); *see also, GICC Capital*, 67 F.3d at 466 (describing open-ended continuity as "past criminal conduct coupled with a threat of future criminal conduct"). In considering whether a continuing threat exists, a court looks at the nature of the enterprise and of the predicate acts. *Cofacrèdit*, 187 F.3d at 242. "Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful," a threat of continued criminal activity is presumed. *Id.*; *see also, Spool*, 520 F.3d at 185. However, where an enterprise is primarily engaged in legitimate business practices, there is no such presumption, and courts look to "other external factors" to determine whether a threat of continued criminal activity exists. *GICC Capital Corp.*, 67 F.3d at 466. In such cases, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." *Spool*, 520 F.3d at 185 (quoting *Cofacrèdit*, 187 F.3d at 243).

Whether predicate acts pose a threat of future conduct is evaluated as of the time the acts are committed. *See United States v. Aulicino*, 44 F.3d 1102, 1110-14 (2d Cir. 1995) (finding open-ended continuity despite the fact that scheme ended before any prosecution was commenced). Open-ended continuity may be shown if, "at the time of occurrence," the

racketeering activity threatens future criminal activity. *City of New York v. LaserShip, Inc.*, 33 F. Supp. 3d 303, 311 (S.D.N.Y. 2014) (quoting *Morrow v. Black*, 742 F. Supp. 1199, 1207 (E.D.N.Y. 1990)). Only if an activity has an "inherently terminable" goal, such as a sale of land, is a threat of continued activity negated as a matter of law. *DeFalco*, 244 F. 3d at 324; *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521 (2d. Cir. 1994) (series of fraudulent sales of securities over at least one year, coupled with evidence that defendants were trying to continue to sell securities, permitted a jury to find a RICO pattern).

The fraudulent scheme alleged by plaintiffs had no obvious ending point. The dealerships were ongoing businesses that advertised used cars on the Internet to a virtually endless supply of consumers. In this regard, they are similar to the defendants in *Liberty Mut. Ins. Co. v. Blessinger*, 2007 WL 951905 (E.D.N.Y. Mar. 27, 2007). Defendants in *Blessinger* owned and operated taxi and limousine companies that were alleged to have made misrepresentations to their insurance carrier to obtain coverage without paying applicable premiums. The Court held that plaintiff, the allegedly defrauded insurance company, established open-ended continuity because defendants' businesses had an ongoing need for insurance, and concluded that "the nature of the predicate acts alleged weighs in favor of a finding of open-ended continuity as they suggest a threat of repetition continuing into the future." *Id.* at *13. Similarly, defendants here continue to operate dealerships, sell used cars to customers, and arrange financing for them. The threat of repetition into the future therefore establishes open-ended continuity.

Although defendants argue that continuity is defeated by Estrada's indictment, this argument fails. First, as noted above, whether predicate acts pose a threat of future conduct is evaluated as of the time the acts are committed. Moreover, while Estrada was certainly a key

player in the fraudulent scheme, he did not act alone. Plaintiffs make numerous allegations of fraudulent behavior by other employees of the dealerships. *See, e.g.,* T: ¶¶ 18, 47-48, 56-57, 61, 65, 138(a), 138(f), 138(j), 138(k). Plaintiffs also allege that Mamdoh Eltouby continues to conduct the affairs of the enterprise as the president of non-party dealership Hillside Motors at an address formerly associated with Planet Motor Cars, the dealership that appeared on the plaintiffs' service contracts. T: ¶ 127.

### D. Conclusion With Respect to RICO

For the reasons stated above, I respectfully recommend that plaintiffs be permitted leave to amend their claims under RICO against all defendants other than M&T Bank, and that the RICO claims against M&T Bank be dismissed.

## III. Plaintiffs' Truth in Lending Act Claims

Plaintiffs Gabrys and Tuhin assert claims against New York Motor Group and M&T Bank pursuant to the Truth in Lending Act ("TILA"). T: ¶¶ 151-69; G: ¶¶ 132-42. Tuhin and Gabrys claim they entered into consumer credit agreements but were not provided the disclosures required by law. Each seeks statutory damages, costs and attorney's fees, and Tuhin also seeks rescission of his sales contract and voiding of any security interests in his car. G: ¶ 142; T: ¶ 169.

M&T Bank moves to dismiss the TILA claims against it, arguing that the statute applies only to creditors, a term defined by statute, and that it is not a creditor as defined by 15 U.S.C. § 1602(g) and Part 226 of Title 12 of the C.F.R., commonly known as Regulation Z.[11] M&T Bank Mem. at 16-17; *see* 12 C.F.R. § 226.1 ("Regulation Z . . . is issued by the Board of

---

[11] Although M&T Bank moves to dismiss TILA claims brought by both Gabrys and Tuhin, Docket Entry 60 in 13-cv-5643, M&T Bank addresses only Tuhin's claim in its memorandum. As mentioned above, the dealership defendants have not submitted any motions in the Tuhin matter and NYMG does not move to dismiss Gabrys' TILA claim. Docket Entry 79.

Governors of the Federal Reserve System to implement the federal Truth in Lending Act.");

*Murphy v. Empire of Am., FSA*, 746 F.2d 931, 933 (2d Cir. 1984).

M&T Bank relies upon *Vincent v. Money Store, LLP*, 736 F.3d 88 (2d Cir. 2013), to support its position. In *Money Store*, the Court of Appeals for the Second Circuit noted that TILA imposes general liability only on creditors and "greatly circumscribes the liability of assignees" such as M&T. 736 F.3d at 105. The Court stressed the statute's definition of a creditor as

> a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. §1602. The Court also relied on Regulation Z, which "interprets the second prong of this definition 'as applying to only "[a] person ... to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract.'" 736 F.3d at 105 (quoting 12 C.F.R. § 226.2(a)(17)(i)).

The question in *Money Store* was whether the assignee of a mortgage could be held liable as a creditor within the meaning of 14 U.S.C. § 1602. The Court of Appeals affirmed the lower court's decision to dismiss the TILA claim against the assignee on summary judgment and held that, even when the initial payment on a loan is made to the assignee, or even when a loan is assigned before funds are disbursed, the assignee is not exposed to the general liability reserved for the entity that appears on the face of the loan agreement. *Id*. at 107. The Court reasoned that TILA is primarily concerned with disclosures by the initial creditor, although it also noted that consumers could, under the statute, exercise their rights to rescission against assignees. *Id*. at 108. Liability may be imposed directly on an assignee, however, "only if the [TILA] violation

. . . is apparent on the face of the disclosure statement." *Id*. at 107 (quoting *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 692 (7th Cir. 1998)); *see also* 15 U.S.C. § 1641 ("[A] violation apparent on the face of the disclosure statement includes, but is not limited to a . . . disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned . . . .").

In reaching its holding, the Second Circuit in *Money Store* relied on a decision with facts similar to those presented here. In *Riviere v. Baner Chevrolet, Inc.*, 184 F.3d 457 (5th Cir. 1999), plaintiff purchased a car from a dealer. Financing was arranged at the time of purchase, and the dealer assigned its interest in the loan to the financing entity. The Court held that, despite financing having been arranged at the time of purchase and the immediate assignment of the loan, the dealer was the creditor obligated to make the disclosures required by TILA and the only party that could be held liable for failing to make those disclosures. 184 F.3d at 460. *Riviere* relied in turn upon the following commentary of the Federal Reserve Board:

> If an obligation is initially payable to one person, that person is the creditor *even if the obligation by its terms is simultaneously assigned to another person.* For example: An auto dealer and a bank have a business relationship in which the bank supplies the dealer with credit sale contracts that are initially made payable to the dealer and provide for immediate assignment of the obligation to the bank. The dealer and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser. Because the obligation is initially payable on its face to the dealer, the dealer is the only creditor in the transaction.

12 C.F.R. pt. 226, supp. I, subpt. A, cmt. 2(a)(17)(i)(2) (emphasis added).

The example in the Federal Reserve Board commentary applies to the facts presented here. Indeed, Gabrys and Tuhin do not contend that their loan documents indicated that their debts were initially payable to M&T Bank. Instead, they argue that M&T Bank may be held liable because the TILA violations they allege were apparent on the face of their loan documents. Pls. Reply at 15. The only violation plaintiffs point to in support of this contention, however, is

their claim that the purchase price exceeded the advertised price or fair market value of their cars. Pls. Reply at 16. As discussed above in connection with plaintiffs' RICO claims, though, plaintiffs do not allege facts suggesting that any discrepancy between the purchase price and the advertised price or fair value of the cars they purchased would be apparent to persons at M&T Bank examining the loan documents. *See Taylor*, 150 F.3d at 694 (holding that "[o]nly violations that a reasonable person can spot on the face of the disclosure statement or other assigned documents will make [an] assignee liable under the TILA").

For all these reasons, M&T Bank's motion to dismiss the TILA claims asserted against it should be granted to the extent plaintiffs seek damages and attorney's fees, but denied to the extent plaintiffs seek rescission. Although only Tuhin explicitly seeks rescission as a remedy for the TILA violations he alleges, Gabrys seeks "further relief as the Court deems appropriate," G: ¶ 142, and should be afforded an opportunity to clarify whether or not he seeks rescission as a remedy.

## IV.    Tuhin's Magnuson-Moss Warranty Act Claim

Plaintiff Tuhin contends the car he was sold was not fit to drive. Based on this contention, he asserts a claim under the Magnuson-Moss Warranty Act ("MMWA") against NYMG and M&T Bank. M&T Bank argues that Tuhin has not adequately stated a claim under the MMWA because he fails to allege a covered form of warranty, fails to establish a breach of the implied warranty of merchantability, and fails to meet the statutory dollar amount threshold under 15 U.S.C. § 2310(d)(3)(B). M&T Bank Mem. at 22-25. Because I conclude that Tuhin has failed to meet the statute's monetary threshold, I do not reach the other arguments raised by M&T Bank.[12]

---

[12] NYMG has not moved to dismiss Tuhin's MMWA claim. Because the deficiency in Tuhin's claim identified by M&T Bank applies as well to NYMG, though, I conclude that his MMWA claim should be dismissed in its entirety.

The Magnuson-Moss Warranty Act authorizes consumers to sue warrantors who fail to comply with any written or implied warranty "for damages and other legal and equitable relief." 15 U.S.C. § 2310(d)(1). A claim under the Act may be brought either in state or federal court. 15 U.S.C. § 2310(d) (1)(A)-(B). However, "[n]o claim shall be cognizable [in federal court] . . . if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs)." 15 U.S.C. § 2310(d)(3)(B). Tuhin paid substantially less than $50,000 for his car. T: ¶ 35. It would seem, therefore, that Tuhin's MMWA claim does not meet the statute's amount-in-controversy requirement.

Tuhin argues that his MMWA claim should proceed for two reasons. First, Tuhin contends that his claim for punitive damages brings the amount in controversy over the statutory threshold. Generally, however, punitive damages are not recoverable under the MMWA; "[i]n breach of warranty suits, which is all that the MMWA permits, damages ordinarily are limited to the difference between the value of the goods accepted and the value they would have had if they had been as warranted." *Lieb v. Am. Motors Corp.*, 538 F. Supp. 127, 133 (S.D.N.Y. 1982). Moreover, Tuhin does not assert a claim for punitive damages under the MMWA in his Proposed Amended Complaint. T: ¶ 180.

Second, Tuhin argues that the statute's $50,000 threshold must be satisfied only when the MMWA provides the sole basis for federal court jurisdiction. Tuhin's RICO and TILA claims give rise to federal question jurisdiction. *See* 28 U.S.C. § 1331. Tuhin argues that this Court may therefore exercise supplemental jurisdiction over his MMWA claim pursuant to 28 U.S.C. § 1367 even if he cannot satisfy the statute's dollar amount threshold.

Federal courts considering whether they may hear MMWA claims involving less than $50,000 pursuant to their supplemental jurisdiction have come to different results. Most courts

in this Circuit, however, have held that, "[i]n enacting Magnuson-Moss, Congress implicitly negated pendent jurisdiction of claims made under the statute that amount to less than $50,000." *Lieb*, 538 F. Supp. at 140; *see also Jager v. Boston Road Auto Mall*, 2015 WL 235342, at *4 (S.D.N.Y. Jan. 16, 2015) (concluding that, "by enacting the specific jurisdictional limitations for Magnuson-Moss claims in federal court, Congress foreclosed the exercise of supplemental jurisdiction" over MMWA claims for less than $50,000). *But see Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 527 (E.D.N.Y. 2006) (concluding, albeit without analysis, that supplemental jurisdiction could be exercised over MMWA claim that did not involve more than $50,000); *Barnes v. West, Inc.*, 249 F. Supp. 2d 737, 739 (E.D. Va. 2003) (holding that "MMWA claims that cannot independently be heard in federal court owing to the absence of the requisite amount in controversy, can still be heard in federal court in circumstances where supplemental jurisdiction is properly exercised under 28 U.S.C. § 1367"); *Samuels v. American Motors Sales Corp.*, 1989 WL 95787, at *2-3 (N.D. Ill. Aug. 9, 1989).

I find the cases holding that supplemental jurisdiction is not available to be more convincing, at least in part because 28 U.S.C. § 1367 itself provides for supplemental jurisdiction "[e]xcept . . . as expressly provided otherwise by Federal statute." Here, a federal statute expressly provides otherwise, and Tuhin's MMWA claim should therefore be dismissed.

## V. Plaintiffs' State Law Claims and Remaining Proposed Amendments

### A. Usury

Tuhin seeks to add a civil usury claim on the grounds that the loan created with NYMG and assigned to M&T Bank provided for interest at a rate higher than the legal limit. Plaintiffs' Memorandum of Law in Support of Motion to Amend ("Pls. Mem."), Docket Entry 72, at 22. This would conform Tuhin's complaint to those filed by the plaintiffs in the related cases, each

of whom other than Dong asserts a usury claim.  Like Tuhin, plaintiffs Gabrys and Chowdhury

obtained loans through NYMG that were assigned to M&T Bank, and each asserts a usury claim

against M&T Bank as well as NYMG.  M&T Bank moves to dismiss each of the usury claims

pending against it.  NYMG has not made a similar motion.

New York's usury statute bars loans carrying annual interest rates of more than sixteen

percent, subject to limited exceptions not relevant here.  N.Y. Gen. Oblig. Law § 5-501; N.Y.

Banking Law § 14-a(1).  A usurious debt "shall be void." N.Y. Gen. Oblig. Law § 5-511.  *See*

*Gerstle v. Nat'l Credit Adjusters, LLC,* 2015 WL 72789, at *6 (S.D.N.Y. Jan. 6, 2015).  To

determine whether a transaction is usurious, a court "looks not to its form, but its substance, or

'real character.'"  *O'Donovan v. Galinski*, 62 A.D.3d 769, 769 (N.Y. App. Div. 2009) (citations

omitted).  While the interest rate stated in the loan documents may be dispositive of whether a

loan is usurious, *see Concord Fin. Corp. v. Wing Fook, Inc.,* 1997 WL 375679, at *5 (S.D.N.Y.

July 7, 1997), a court may properly consider whether a lender is extracting a usurious rate of

interest through deceptive means, such as by imposing excessive fees or inflating the loan's

principal amount, *see Hillair Capital Investments, L.P. v. Integrated Freight Corp.,* 963 F. Supp.

2d 336, 339 (S.D.N.Y. 2013).

M&T Bank contends that plaintiffs' usury claims must be dismissed because each of the

relevant RICs provides for interest at a rate below sixteen percent and because there is "NO

substantive evidence submitted that M&T Bank has violated [New York's usury law]."  M&T

Bank Mem. at 21 (emphasis in original).  Plaintiffs do not dispute M&T Bank's contention that

the interest rates appearing on the RICs are below sixteen percent.  Pls. Reply at 14.  Plaintiffs

contend, however, that the RICs obscure the actual rate of interest charged because they are

based on higher sales prices for the purchased vehicles than agreed to and because they impose

fees for unwanted products and services that functioned in reality as additional finance charges. T: ¶¶ 227-29; G: ¶¶ 218-20; C: ¶¶ 225-27.

Regarding fees, a lender may charge reasonable expenses "attendant on a loan without rendering the loan usurious," provided that the expenses charged are not "a pretext for higher interest." *Lloyd Corp. v. Henchar, Inc.,* 80 N.Y.2d 124, 127 (1992). Reasonable expenses may include, for example, attorney's fees associated with making the loan. *Durante Bros. & Sons, Inc. v. Flushing Nat. Bank,* 652 F. Supp. 101, 105 (E.D.N.Y. 1986). However, when fees do not in fact reimburse a lender for expenses incurred in extending a loan but are instead "a disguised loan payment," the fees are appropriately considered when determining the effective interest rate. *Hillair*, 963 F. Supp. 2d at 339 (denying summary judgment on usury defense because, among other things, purpose of fee payments was unclear).

A court may also question the principal indicated in a loan agreement to determine whether the loan is usurious. In *Durante*, the court examined a loan with a disputed principal amount and granted summary judgment dismissing a usury claim only after concluding that the interest charged did not reach a usurious level even under the borrower's calculation of the principal amount. 652 F. Supp. at 104*; see also Hillair*, 963 F. Supp. 2d at 339 (denying summary judgment on usury defense because, among other things, borrowers asserted that principal amount of loans was artificially inflated).

Here, plaintiffs argue that the difference between the prices they agreed to pay and the principal amounts that appear on their RICs should be counted as interest in determining whether their loans are usurious. Plaintiffs argue in addition that products and services that were purportedly required for financing were in reality disguised loan payments that should also be calculated as interest. If plaintiffs' contentions are accepted, the figures that appear in plaintiffs'

pleadings yield rates far above those that appear on their respective RICs, and far above sixteen per cent per year. Tuhin, for example, claims that he agreed to purchase a car for $12,000, made a $2,000 down payment, and agreed to borrow $10,000 over six years. T: ¶¶ 18, 23, 26, 29-30. NYMG, however, had Tuhin sign a retail installment contract for $26,209. T: ¶ 35. Gabrys alleges that he agreed to pay $19,000 for his car, putting down $10,000 in cash and financing the remainder over five years. G: ¶¶ 48-49, 55. The RIC prepared by NYMG, however, listed a cash price of $30,895 and a total sales price of $34,966.48. G: ¶¶ 65, 67. Finally, Chowdhury agreed to a purchase price of $13,500 and made a down payment of $10,000. C: ¶¶ 55-57. Unlike Tuhin and Gabrys, Chowdhury orally agreed to a short-term loan. C: ¶ 67. NYMG nevertheless obligated her to a RIC with a cash price of $24,471 and an amount financed of $14,911.99. C: ¶ 77.

Clearly, if the allegedly undisclosed increases in purchase prices and fees for services and products are considered interest, each plaintiff was charged an annual rate far greater than sixteen per cent. [13] For these reasons, I recommend that M&T Bank's motion to dismiss the usury claims asserted by Tuhin, Gabrys and Chowdhury against it be denied.

### B. New York General Business Law Section 349

Plaintiffs Chowdhury and Tuhin assert claims under Section 349 of New York's General Business Law against NYMG and M&T Bank. Plaintiff Gabrys seeks to add a claim against M&T Bank under this statute, and Tuhin seeks to clarify the basis upon which he asserts M&T

---

[13] The total interest owed on Tuhin's $10,000 loan would be $5,198.68 if amortized over five years at 16%. Similarly, the total interest owed on Gabrys' $9,000 loan would be $3,827.91 if amortized over six years at 16%. The interest payments at 16% amount to only a fraction of each plaintiff's agreed upon principal. Given that the fees, interest, and difference in principal on the RICs require the plaintiffs to pay a figure more than double the amounts financed, it is clear that the loans exceed 16%. As stated above, Chowdhury differs from Tuhin and Gabrys in that she did not orally agree to a multi-year loan and arranged for only $3,500 in financing. However, it is equally clear that the loan she received was usurious since the "amount financed" on the RIC, $14,911.99, is quadruple the amount she actually agreed to borrow.

Bank's direct liability for his pending Section 349 claim. Pls. Mem. at 19. M&T Bank opposes leave to amend and cross-moves to dismiss each of the Section 349 claims asserted against it. M&T Bank Mem. at 21-22.

Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). "To state a claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam)). Section 349 claims are not subject to Rule 9(b)'s heightened pleading standard. *Ackerman v. Coca-Cola Co.,* 2010 WL 2925955, at *22 (E.D.N.Y. July 21, 2010) (*citing Pelman ex rel. Pelman v. McDonald's Corp.,* 396 F.3d 508, 511 (2d Cir. 2005)).

Plaintiffs allege that M&T Bank is liable under Section 349 because it claimed it could not undo the fraudulent transactions plaintiffs entered into with NYMG, promised an investigation it never conducted, and continued to collect on plaintiffs' loans even after hearing plaintiffs' complaints of fraud. T: ¶ 192; G: ¶¶ 258-60; C: ¶¶ 263-65. Although M&T Bank's bases for challenging plaintiffs' Section 349 claims are not articulated clearly in its submissions, M&T Bank apparently contends that plaintiffs fail to allege that its actions were materially misleading or that any actions it took were consumer-oriented. M&T Bank Mem. at 21-22; M&T Bank Reply at 12.

The New York Court of Appeals considered whether certain conduct was consumer-oriented and therefore within the scope of Section 349 in *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20 (1995). The court held that

> Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior. The statute itself does not require recurring conduct. Moreover, the legislative history makes plain that this law was intended to "afford a practical means of halting consumer frauds at their incipiency without the necessity to wait for the development of persistent frauds" (*see,* Mem. of Governor Rockefeller, 1970 N.Y. Legis. Ann., at 472-73). Plaintiff, thus, need not show that the defendant committed the complained-of acts repeatedly – either to the same plaintiff or to other consumers – but instead must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute.

85 N.Y.2d at 25. The test is whether the actions complained of "potentially affect similarly situated consumers." *Id*. at 26-27; *see also, Wilson v. Nw. Mut. Ins. Co.,* 625 F.3d 54, 64 (2d Cir. 2010); *MaGee v. Paul Revere Life Ins. Co.,* 954 F. Supp. 582, 586 (E.D.N.Y. 1997) ("[T]he injury must be to the public generally as distinguished from the plaintiff alone." (citations omitted)).

Plaintiffs in *Oswego* were union pension funds that opened accounts with the defendant bank. Plaintiffs complained that the bank failed to pay appropriate interest on the balances in their accounts. Although plaintiffs were pension funds and not individuals or consumers as that term is typically used, the Court of Appeals held that plaintiffs satisfied the "consumer-oriented" element of Section 349, reasoning that "defendant Bank dealt with plaintiffs' representative as any customer entering the bank to open a savings account, furnishing the [plaintiff] Funds with standard documents presented to customers upon the opening of accounts." 85 N.Y.2d at 26. M&T Bank, it seems, likewise dealt with Tuhin, Gabrys and Chowdhury just like it would any other customer seeking a car loan; indeed, M&T Bank argues in opposition to plaintiffs' other claims, at least implicitly, that there was nothing unusual about the RICs assigned to it by NYMG that should have raised a red flag. *See* M&T Bank Mem. at 15. Moreover, the ordinary meaning of the term "consumer" more clearly applies to plaintiffs here than to the pension funds in *Oswego*. Finally, the fact that M&T Bank treated all three plaintiffs in a similar manner lends

further support to the conclusion that the "consumer-oriented" prong of a Section 349 claim has been sufficiently alleged.  *See Riordan v. Nationwide Mut. Fire Ins. Co*, 977 F.2d 47, 53 (2d Cir. 1992) (holding that evidence of defendant insurance company's similar practices in its dealings with other policyholders satisfied Section 349's consumer-oriented element).

Plaintiffs fare less well, though, in their efforts to allege that M&T Bank engaged in materially misleading conduct that caused them injury.  An act or practice is materially misleading if it is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Oswego,* 85 N.Y.2d at 26.  Proof of scienter, though, is not required.  *Id.*; *Watts v. Jackson Hewitt Tax Serv. Inc.,* 579 F. Supp. 2d 334, 346 (E.D.N.Y. 2008).  In addition to establishing having been misled, "a plaintiff must prove 'actual' injury . . ., though not necessarily pecuniary harm."  *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (2000) (citing *Oswego*, 85 N.Y. 2d at 26).

Plaintiffs fail to allege facts demonstrating that M&T Bank misled them or caused them injury.  As noted above, plaintiffs first contend it was misleading for M&T Bank to claim that it could not cancel their loans based upon their complaints and to continue to collect payments from them despite those complaints.  However, plaintiffs neither explain why, nor provide precedent establishing that, a consumer who is fraudulently induced by a retailer to make a purchase, and who finances that purchase with a loan assigned to a bank, is entitled to cease making loan payments prior to or while seeking legal redress from the retailer.  Plaintiffs do not allege that M&T Bank sought to hinder their attempts to pursue legal remedies that could result in the rescission of their loans, and in fact acknowledge that M&T Bank suggested that plaintiffs might consult a lawyer or report NYMG to the New York State Attorney General.

M&T Bank's representations about investigating plaintiffs' complaints may or may not have been accurate, but in either case plaintiffs fail to identify any injury they suffered as a result of those representations. Plaintiffs do not point to any authority suggesting that M&T Bank owed them a duty to investigate. Nor do they contend that, in reliance on M&T Bank's representations, they put off taking action to protect their rights, or if they did, that they were as a result hindered in any way in asserting their rights later.

For all these reasons, Gabrys' motion for leave to amend to add a Section 349 claim against M&T Bank should be denied, and M&T Bank's motion to dismiss the Section 349 claims brought against it by Tuhin and Chowdhury should be granted.

### C. Negligent Hiring

Plaintiff Tuhin moves for leave to add a negligent hiring claim against NYMG and Mamdoh Eltouby. Pls. Mem. at 23; T: ¶¶ 245-97. The other plaintiffs also seek to assert negligent hiring claims. A: ¶¶ 194-203; F: ¶¶ 301-09; G: ¶¶ 289-97; D: ¶¶ 272-80; C: ¶¶ 291-99. A claim for negligent hiring requires a showing that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Dewitt v. Home Depot U.S.A., Inc.*, 2012 WL 4049805, at *6 (E.D.N.Y. Sept. 12, 2012) (quotation marks and citations omitted).

Mamdoh Eltouby opposes the motion on the ground that personal liability for corporate acts requires proof that the individual engaged in wrongdoing, and that plaintiffs fail to allege facts suggesting any malfeasance on his part. NYMG Reply at 3. Plaintiffs, however, do allege facts giving rise to a plausible inference that Mamdoh Eltouby knew of Estrada's propensity for fraud, hired him anyway, and refused to consider complaints made against him. As discussed above in connection with plaintiffs' RICO claims, Mamdoh Eltouby is alleged to have owned

and operated NNYMG at the time plaintiffs' transactions took place, attempted to assault customers complaining about having being defrauded, and hired Estrada *after he had been indicted and arrested for defrauding customers while working at other used car dealerships*. It is plausible to infer that an individual who owns a used car dealership would be aware that someone working in the same field had been indicted for fraud in connection with the sale of used cars. Indeed, plaintiffs allege that Eltouby hired Estrada despite a public announcement from the Queens County District Attorney that Estrada had defrauded more than 23 consumers out of more than $115,000 with the promise that they could return to him to refinance their high interest loans after six months of timely payments. T: ¶ 80.

This aspect of plaintiffs' motion should therefore be granted, and plaintiffs should be permitted to pursue their negligent hiring claims against NYMG and Mamdoh Eltouby.

    D.  Remaining Issues

Tuhin seeks to add a negligence claim against M&T Bank based on information he obtained after filing his complaint. Pls. Mem. at 24-25. Additionally, Tuhin, Gabrys, and Chowdhury seek leave to identify properly as Manufacturers and Traders Trust Company the entity they incorrectly sued as "M&T Bank Corporation." Pls. Mem. at 24. M&T Bank has not submitted any opposition to either of these applications, and these aspects of plaintiffs' motion should therefore be granted.

**CONCLUSION**

Plaintiffs' motion for leave to amend their complaints is granted except with respect to those claims I recommend be dismissed. For all the reasons stated above, I respectfully recommend that defendants' motions to dismiss be denied, except that the following claims be dismissed:

1) Plaintiffs' RICO claims against M&T Bank;

2) Plaintiffs' TILA claims for damages (but not rescission) against M&T Bank;

3) Plaintiff Tuhin's Magnuson-Moss Warranty Act claim; and

4) Plaintiffs' New York General Business Law claims against M&T Bank.

Any objections to the recommendations made in this Report must be filed within fourteen days of this Report and Recommendation and, in any event, on or before June 22, 2015. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).


       /s/
STEVEN M. GOLD
United States Magistrate Judge

Brooklyn, New York
June 3, 2015


*U:\KJ 2014-15\New York Motor Group Cases\Motion to Amend-Cross Motion to Dismiss Final.docx*